IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

```
                                  )
UNITED STATES OF AMERICA,         )  CR 07-00615 SOM
                                  )
            Plaintiff,            )  Honolulu, Hawaii
        vs.                       )  August 28, 2008
                                  )  9:00 A.M.
(01) BENJAMIN ACUNA,              )
(02) ANABEL VALENZUELA,           )
(03) EDDY OLGUIN,                 )
                                  )
            Defendants.           )
_____  )
```

TRANSCRIPT OF JURY TRIAL (DAY 13)
BEFORE THE HONORABLE SUSAN OKI MOLLWAY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Government: | MARK A. INCIONG<br>CLARE CONNORS<br>Office of the U.S. Attorney<br>PJKK Federal Bldg.<br>300 Ala Moana Blvd. Ste. 6100<br>Honolulu, HI 96850 |
| For the Defendant<br>Benjamin Acuna: | JEFFREY T. ARAKAKI<br>1188 Bishop St., Ste. 1604<br>Honolulu, HI 96813 |
| For the Defendant<br>Anabel Valenzuela: | BRANDON K. FLORES<br>P. O. Box 62150<br>Honolulu, HI 96839 |
| For the Defendant<br>Eddy Olguin: | GURMAIL G. SINGH<br>220 S. King St., Ste. 2150<br>Honolulu, HI 96813 |
| Official Court Reporter: | Debra Kekuna Chun, RPR, CRR<br>United States District Court<br>300 Ala Moana Blvd. Ste. C285<br>Honolulu, HI 96850<br>(808) 534-0667 |

Proceedings recorded by machine shorthand, transcript produced with computer-aided transcription (CAT).

THURSDAY, AUGUST 28, 2008          9:01 O'CLOCK A.M.

(In open court without the jury:)

THE COURT:  The jury isn't here.  We have counsel for the government, for all three defendants, we have the three defendants, and Mr. Saibene here.

I just wanted to put on the record that last evening off the record we had sent a proposed jury instruction to counsel.  Is there any -- this was on an instruction on what the jury could do, if it believed any witness had been impeached.

And can this be given by agreement?

Yes?  Okay.  There being --

MR. INCIONG:  Yes, Your Honor.

THE COURT:  -- no objection, I'm adding that by agreement.

I think we sent the final version of the jury instructions to everyone.  Have you folks gotten a copy of that?  Let me see if I can get a copy.

And is there any problem with any of the instructions?  All prior objections are incorporated, but other than what has been specifically objected to on the record, does anyone want to articulate any objection to the instructions or to the order of the instructions?

Mr. Inciong.

MR. INCIONG:  None from the United States, Your

Honor.

MR. ARAKAKI:  No, Your Honor.

MR. FLORES:  No, Your Honor.

MR. SINGH:  No, Your Honor.

THE COURT:  Okay.  Then let's bring the jury in.

We can stay off the record.

(Discussion off the record.)

(Jury enters.)

THE CLERK:  Criminal 07-615SOM, United States of America versus, defendant 1, Benjamin Acuna; defendant 2, Anabel Valenzuela; and, defendant 3, Eddy Olguin.  This case has been called for Further Jury Trial.

Counsel, please make your appearances for the record.

MR. INCIONG:  Good morning, Your Honor.  Mark Inciong for the United States.  Present with me is Gerald Lawson of the DEA.

MS. CONNORS:  Good morning, Your Honor.  Clare Connors on behalf of the United States with Special Agent Christian Mickelsen of the IRS.

MR. ARAKAKI:  Good morning, Your Honor.  Jeff Arakaki on behalf of Benjamin Acuna.  Also present is Miguel Saibene, Spanish interpreter.

MR. FLORES:  And good morning, Your Honor.  Brandon Flores on behalf of Anabel Valenzuela, who is present.

MR. SINGH:  Good morning, Your Honor.  Gary Singh

with Eddy Olguin.

THE COURT:  Okay.  Good morning.  You can all be seated.

Ladies and gentlemen, I'm going to be instructing you on the law, and then you will hear the attorneys' closing arguments.

We're going to go off the record while we try to get copies of the jury instructions.  You will each get your own copy.  You are free to write on this copy.  You can take it into deliberations with you.  This is your copy to work with.  Okay.  But I'm going to read them out loud, and you can follow along.  Then you'll get to keep your copy with you through the end of the case.

So if you can wait a little while, we're trying to track down where the copies are.  We're going to go off the record a minute.

(Discussion off the record.)

THE COURT:  I should -- while we're waiting, I should tell the jurors that it's highly likely that we'll take a late lunch today.  So during your breaks, if you have any snacks, you might want to eat them.  I'm thinking that we may not break for lunch until 1:00.  Okay.  But at that point our hope is that the case will be in your hands.  Okay.

(Discussion off the record.)

THE COURT:  Members of the jury, now that you have

heard all the evidence, it is my duty to instruct you on the law which applies to this case.  A copy of these instructions will be available in the jury room for you to consult.

Actually, you will each have your own copy.

It is your duty to find the facts from all the evidence in the case.  To those facts you will apply the law as I give it to you.  You must follow the law as I give it to you, whether you agree with it or not, and you must not be influenced by personal likes or dislikes, opinions, prejudices, or sympathy.  That means that you must decide the case solely on the evidence before you.  You will recall that you took an oath promising to do so at the beginning of the case.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all equally important.  You must not read into these instructions or into anything the court may have said or done any suggestion as to what verdict you should return -- that is a matter entirely up to you.

The evidence from which you are to decide what the facts are consists of:

1.  The sworn testimony of any witness;

2.  The exhibits which have been received into evidence; and

3.  Any facts to which all the lawyers have stipulated.

In reaching your verdict you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence and you may not consider them in deciding what the facts are.  I will list them for you:

1.  Arguments and statements by lawyers are not evidence.  The lawyers are not witnesses.  What they have said in their opening statements or say in their closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

2.  Questions and objections by lawyers are not evidence.  Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence.  You should not be influenced by the question, the objection, or the court's ruling on it.

3.  Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.  In addition, some testimony and exhibits have been received only for a limited purpose; where I have given a limited -- where I have given a limited instruction, you must follow it.  I should reread that.  Where I have given a limiting instruction, you must follow it.

4.  Anything you may have seen or heard when the court was not in session is not evidence.  You are to decide

the case solely on the evidence received at the trial.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.

In considering the testimony from any -- in considering the testimony of any witness, you may take into account:

1.  The opportunity and ability of the witness to see or hear or know the things testified to;

2.  The witness' memory;

3.  The witness' manner while testifying;

4.  The witness' interest in the outcome of the case and any bias or prejudice;

5.  Whether other evidence contradicted the witness' testimony;

6.   The reasonableness of the witness' testimony in light of all the evidence; and

7.   Any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.

A witness may be discredited or impeached by contradictory evidence, by a showing that the witness testified falsely concerning a material matter, or by evidence that at some other time the witness said or did something that is inconsistent with the witness' present testimony or failed to say or do something that would be consistent with the present testimony, had it been said or done.

If you believe that any witness has been so impeached, then it is your exclusive province to give the testimony of that witness such credibility or weight, if any, as you may think it deserves.

You have heard testimony from witnesses who:

1.   Have received or may receive benefits from the government in connection with this case;

2.   Admitted being accomplices to the crime charged; and/or

3.   Pleaded guilty to a crime arising out of the same events for which the defendants are on trial.

An accomplice is one who voluntarily and intentionally joins with another person in committing a crime.

Someone else's guilty plea is not evidence against the defendants, and you may consider it only in determining that witness' believability.

For these reasons, in evaluating witnesses' testimony you should consider the extent to which or whether witnesses' testimony may have been influenced by any of these factors.  In addition, you should examine these witnesses' testimony with greater caution than that of other witnesses.

A defendant in a criminal case has a constitutional right not to testify.  No presumption of guilt may be raised, and no inference of any kind may be drawn, from the fact that a defendant did not testify.

As stated earlier, a defendant has a right not to testify.  If a defendant does testify, however, the defendant's testimony should be weighed and considered, and the defendant's credibility determined, in the same way as that of any other witness.

You have heard evidence of other crimes engaged in by one or more defendants.  You may consider that evidence only as it bears on a defendant's knowledge or absence of mistake or accident, and for no other purpose.

You have heard testimony from persons who, because of education or experience, are permitted to state opinions and the reasons for their opinions.

Opinion testimony should be judged just like any

other testimony.  You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness' education and experience, the reasons given for the opinion, and all the other evidence in the case.

Certain charts and summaries have been received into evidence.  Charts and summaries are only as good as the underlying supporting material.  You should, therefore, give them only such weight as you think the underlying material deserves.

The parties have agreed to certain facts that have been stated to you.  You should, therefore, treat these facts as having been proved.

Proof beyond a reasonable doubt that leaves you -- proof beyond a reasonable doubt is proof that leaves you firmly convinced that a defendant is guilty.  It is not required that the government prove guilt beyond all possible -- I'm sorry. It is not required that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation.  It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence.

If, after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that a defendant is guilty, it is your duty to find that

defendant not guilty.  On the other hand, if, after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that a defendant is guilty, it is your duty to find that defendant guilty.

The defendants are charged in count 1 of the First Superseding Indictment with conspiring to possess and to possess with intent to distribute -- I'm sorry.  I'm going to read that again.

The defendants are charged in count 1 of the First Superseding Indictment with conspiring to distribute and to possess, with intent to distribute, 50 grams or more of methamphetamine -- now, you should take your pens and you should cross out that word "a" in front of methamphetamine -- in violation of Sections 846 and 841(a)(1) of Title 21 of the United States Code.  In order for a defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, beginning at a date unknown but by at least 2000 and continuing up to and including September 2005, there was an agreement between two or more persons to distribute and to possess, with intent to distribute methamphetamine, a Schedule II controlled substance; and

Second, a defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

I shall discuss with you briefly the law relating to each of these elements.

A conspiracy is a kind of criminal partnership -- an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy.  It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find that there was a plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy, with all of you agreeing as to the particular crime which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy.  Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators.  On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a

conspirator.  Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

An overt act does not itself have to be unlawful.  A lawful act may be an element of a conspiracy, if it was done for the purpose of carrying out the conspiracy.  The government is not required to prove that the defendants personally did one of the overt acts.

If you find a defendant guilty of knowingly and intentionally conspiring to possess with intent to distribute, and to distribute methamphetamine, its salts, isomers, and salts of its isomers, then you must also determine the amount of methamphetamine, its salts, isomers, and salts of its isomers, that was involved in the entire conspiracy and that the defendant is legally responsible for, indicating the amount by having your foreperson mark the appropriate place on the verdict form.  You shall consider the following options to the extent you find them proven beyond a reasonable doubt:

1.  50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers;

2.  5 grams or more, but less than 50 grams, of methamphetamine, its salts, isomers, and salts of its isomers; or

3.  Less than 5 grams of methamphetamine, its salts, isomers, and salts of its isomers.

A conspiracy may continue for a long period of time and may include the performance of many transactions.  It is not necessary that all members of the conspiracy join it at the same time, and one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members.

Even though a defendant did not directly conspire with the other defendants in the overall scheme, a defendant has, in effect, agreed to participate in the conspiracy if it is proved beyond a reasonable doubt that:

1.  That defendant directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy;

2.  That defendant knew or had reason to know that other conspirators were involved with those with whom the defendant directly conspired; and

3.  That defendant had reason to believe that whatever benefits the defendant might get from the conspiracy were probably dependent upon the success of the entire venture.

It is no defense that a person's participation in a conspiracy was minor or for a short period of time.

An act is done knowingly if a defendant is aware of the act and does not act through ignorance, mistake, or accident.  The government is not required to prove that a defendant knew that his or her acts or omissions were unlawful.

You may consider evidence of a defendant's words, acts, or omissions, along with all the other evidence, in deciding whether that defendant acted knowingly.

You are instructed as a matter of law that d-methamphetamine hydrochloride is a salt of methamphetamine and a Schedule II controlled substance.

Mere presence at the scene of a crime or mere knowledge that a crime is being committed is not sufficient to establish that a defendant committed the crime of conspiracy to distribute and possess, with intent to distribute, methamphetamine, unless you find that that defendant was a participant and not merely a knowing spectator.  A defendant's presence may be considered by the jury along with other evidence in the case.

The defendants Benjamin Acuna and Anabel Valenzuela are charged in count 3 of the First Superseding Indictment with conspiring to commit money laundering acts with the proceeds of the drug trafficking conspiracy charged in count 1.

Title 18, United States Code, Section 1956(h), makes it a federal crime or offense for anyone to conspire or agree with someone else to do something which, if actually carried out, would be a violation of Title 18, United States Code, Section 1956.

Title 18, United States Code, Section 1956, makes it unlawful to knowingly conduct financial transactions that

affect interstate or foreign commerce with proceeds derived from a specified unlawful activity, in this case:  the drug distribution conspiracy charged in count 1, either (1) with the intent to promote the carrying on of the specified unlawful activity, or (2) knowing that the transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity.

For Benjamin Acuna and Anabel Valenzuela to be found guilty of this charge, the United States must prove each of the following elements as to each defendant beyond a reasonable doubt:

First, that two or more persons, in some way or manner, came to a mutual agreement that they would conduct financial transactions with the proceeds of the conspiracy to distribute and possess with intent to distribute methamphetamine, as charged in count 1 of the First Superseding Indictment, with the intent to promote the carrying on of said unlawful activity or knowing that the transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity; and

Second, that the defendants became members of the conspiracy knowing of at least one of its objectives and intending to help accomplish it.

As I previously instructed you regarding count 1, a conspiracy is an agreement to do something unlawful.  It is a kind of partnership in crime.  One may become a member of a conspiracy without knowing all of the details of the unlawful plan or the identities of all of the other alleged conspirators.  If a defendant has an understanding of the unlawful character of a plan, and then knowingly joins in an unlawful scheme, that is sufficient to convict him or her of conspiracy, even though he or she may have played only a minor part in the conspiracy.

The evidence does not need to show that the members of the conspiracy entered into an express or formal agreement, or that they directly stated between themselves the details of the scheme and its object or purpose, or the precise means by which the object or purpose was to be accomplished.

Title 18, United States Code, Section 1956(a)(1), makes it unlawful for a person, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, to conduct such financial transaction, either (1) with the intent to promote the carrying on of the specified unlawful activity, or (2) knowing that the transaction was designed in whole -- I need you to take your pens and to change that word "and" after the word "whole" to the word "or."

Counsel, is there agreement on that?

MR. ARAKAKI:  Yes.

MR. FLORES:  (Nods head.)

THE COURT:  Everyone seems to be saying yes.

Okay.  So starting with the numeral 2:  Or (2) knowing that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity.

You are instructed that conspiracy to distribute and possess, with intent to distribute, methamphetamine in any amount is an unlawful activity under applicable federal law. However, it is for you to determine whether the funds were the proceeds of that unlawful activity.

The term "financial transaction" means a transaction involving a financial institution that is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree, or a transaction that in any way or degree affects interstate or foreign commerce and involves the movement of funds by wire or other means, or involves one or more monetary instruments, or involves the transfer of title to any real property or vehicle.

The United States need not prove that all of the property involved in the money laundering transactions charged in the indictment was the proceeds of a specified unlawful activity.  It is sufficient if the United States proves that at least part of the property represents such proceeds.  Thus, a

financial transaction involves proceeds of a specified unlawful activity even when proceeds of a specified unlawful activity are commingled in an account with legitimately earned funds or funds that are not proceeds of a specified unlawful activity.

The indictment is not evidence.  The defendants have pleaded not guilty to the charges.  The defendants are presumed to be innocent and do not have to testify or present any evidence to prove innocence.  The government has the burden of proving every element of the charge beyond a reasonable doubt.

The proof need not establish with certainty the exact dates of the alleged offenses.  It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offenses were committed on a date reasonably near the dates alleged in the indictment.

You, as jurors, are the judges of the facts.  But in determining what actually happened in this case -- that is, in reaching your decision as to the facts -- it is your sworn duty to follow the law I am now in the process of defining for you. Unless otherwise stated, you should apply each instruction separately and individually to each defendant on trial.

A separate crime or offense is charged against one or more of the defendants in each count of the indictment.  Each offense, and the evidence pertaining to it, should be considered separately.  Also, the case of each defendant should be considered separately and individually.  The fact that you

may find one or more of the accused guilty or not guilty of any of the offenses charged should not control your verdict as to any other -- other offense or any other defendant.

I caution you, members of the jury, that you are here to determine from the evidence in this case whether the defendants are guilty or not guilty.  The defendants are not on trial for any act or conduct or offense not alleged in their respective indictments.  Nor are you called upon to return a verdict as to whether any other person or persons not on trial as defendants in this case are guilty or not guilty.

The punishment provided by law for this crime is for the court to decide.  You may not consider punishment in deciding whether the government has proved its case against the defendant -- that should be defendants; so add an "s" -- beyond a reasonable doubt.

Some of you have taken notes during the trial. Whether or not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory. You should not be overly influenced by the notes.

When you begin your deliberations, you should elect one member of the jury as your foreperson.  That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with the other jurors to reach agreement, if you can do so.  Your verdict, whether guilty or not guilty, must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion, if the discussion persuades you that you should.  But do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

A verdict form has been prepared for you.

Now, you will be receiving a verdict -- a separate verdict form for each of the three defendants.  You will be asked for count 1 for each of the three defendants whether you find that defendant guilty or not guilty.  If you reach a guilty verdict on count 1, then you will be asked to state the amount, given the three choices that we've already discussed.  With respect to Benjamin Acuna and Anabel Valenzuela, you will also be asked to state whether you find each of those defendants guilty or not guilty of count 3.  So you will simply put an X or a checkmark in the appropriate box.

After you have reached unanimous agreement on a verdict, your foreperson will fill in the form that has been

given to you, sign and date it, and advise the court that you are ready to return to the courtroom.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff, signed by your foreperson or by one or more members of the jury.  No member of the jury should ever attempt to communicate with me, except by a signed writing, and I will respond to the jury concerning the case only in writing, or here in open court.  If you send out a question, I will consult with the lawyers before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone -- including me -- how the jury stands, numerically or otherwise, on the question of the guilt of a defendant until after you have reached a unanimous verdict or have been discharged.

Okay.  Now, at this time let me invite Mr. Inciong to present the government's closing argument.

MR. INCIONG:  Thank you, Your Honor.

May it please the court.  Mr. Arakaki, Mr. Flores, Mr. Singh.  Good morning, ladies and gentlemen.

For the last three weeks you've heard dozens of witnesses, 44 to be exact, along with dozens of exhibits that were admitted into evidence, all of which gave you a long look into a lifestyle and a segment of our society that is probably as foreign to most of you as if we had brought in a lost tribe

from the Amazon, who explained the way that they lived.  This is a lifestyle and a culture where greed and selfishness rule the day, where no one comes before me, whoever me happens to be at the time, where nothing is more important than cold hard cash.

You saw staggering amounts of drugs in this case.  Obscene amounts of money.  All of which was part of a routine day in the lives of Benjamin Acuna, Anabel Valenzuela, and Eddy Olguin, along with all the other cooperating witnesses who testified in this case.

Through the three weeks, I guess, of testimony that we've had, I will say I noticed that you have been one of the most attentive juries I've ever had the privilege of presenting a case to, some of the most copious notetakers I've seen, and I know that I speak for the defense counsel in telling you how much we appreciate and our gratitude for the seriousness and the diligence that you've approached your duty in this case.

The court just read through the jury instructions, which are long, there are many, but they are very important in this case.  They are, basically, the rule book that you'll need to follow in deciding your verdict in this case.  It's just as if you were playing soccer or basketball or any sport for the first time.  We wouldn't have you go out there and just play and then give you the rules later.  We would explain the rules first, and then you would go play.  That's kind of the role of

the jury instructions.

So each of those are important, but I am going to be emphasizing and having you refer to certain portions and certain instructions along the way as I go through the evidence and give you the aspects that I believe will be important to your deliberations in this case when you apply the law, as you were just instructed on, to the facts that have come out in this trial.

As the court instructed you, for the two crimes that are charged in this case there are two elements for each of those crimes. Those elements are what the government must prove beyond a reasonable doubt before you can reach a guilty verdict on any of the counts. So those are the things that I want to start with when we go through this case.

Count 1 again is the conspiracy to distribute and possess with intent to distribute methamphetamine. Again the elements are, first, that beginning at a date unknown but by at least 2000 and continuing up until September 2005, there was an agreement between two or more persons to distribute and to possess with intent to distribute methamphetamine, a Schedule II controlled substance. Secondly, whether or not any of these three defendants became a member of that conspiracy, knowing of at least one of its objects or one of its goals, and intending to help accomplish it.

I think it's useful to go first and start with

whether there are any facts that are not disputed in this case. And the one that I will start with is methamphetamine.

We know that there was methamphetamine seized in this case. Monica Price, as you recall, she was the DEA chemist who came in and testified to her analysis of the drugs, the instructions instruct you that methamphetamine is a Schedule II controlled substance. And I'll get into this a little bit more later, but as the court instructed you, if you reach a guilty verdict on this count, you will then need to make a subsequent determination of how much methamphetamine was involved in this case. Was it more than 50 grams? Was it between 5 and 50 grams? Was it less than 5 grams? Well, clearly, in this case there's to dispute either as to that there was more than 50 grams. There were 34 pounds, approximately, seized on the search warrant of Mr. Honda was arrested. And if you recall, when he was arrested, Mr. Honda had several hundred grams of methamphetamine in his possession. So there's no question as to the amount of methamphetamine or whether there was methamphetamine seized in this case.

Additionally, Mr. Acuna, when he testified yesterday, he admitted that he sold himself, distributed to Miss Bulacan, amounts of methamphetamine ranging from an eightball, which if you recall from the testimony is about three-and-a-half grams of methamphetamine, up to 7-gram amounts, which he distributed to her on three or four occasions. So Mr. Acuna has already

admitted that he distributed more than 5 grams.  So if there was any question as to the 50 grams, which I submit to you there is not, there's also that proof in this case that was provided by Mr. Acuna himself.

These are the drugs, this was the box, that was found in Eric Shimomura's townhouse after Francis Honda was arrested in September of 2005.  Those are the drugs, the 33 or 34 pounds approximately, after they were removed and taken back to the DEA office.  Those are the drugs again when they arrived at the DEA lab for testing.  That's one of the bags out of that group. And again there's a collection of bags.  So again clearly more than 50 grams.

Those exhibits are in evidence.  You will have those to look at in the binder.  You will also have with you the actual drugs, which are exhibits 3 and 4.

And let me correct myself.  You won't have these back in the jury room, but they will be available for you to view, if you wish.  You understand why they don't leave these back in the jury room with you.

The defense may pose the question to you, though, Well, how are these drugs connected to our clients?  These drugs were seized from Mr. Honda and found at Mr. Honda's friend's apartment.  Mr. Honda testified he had never met these people.

Well, it goes to the conspiracy law that you were

just instructed on.  And if you go to page 20, if you wish, in your instructions in which you were just given, it describes to you and explains exactly that portion of the conspiracy law. And, specifically, it says it is not necessary that all members of the conspiracy join it at the same time, and one may become a member of a conspiracy without full knowledge of all of the details of the unlawful scheme, of the names, identities, or locations of all of the other members.

So that is not necessary as long as the following things below that are proven beyond a reasonable doubt.  And we'll talk about that a little bit more later.

But -- so the bottom line is, as long as you are part of the conspiracy, you need not know everybody in the conspiracy, you need not know what everybody in the conspiracy is doing.  As long as it is foreseeable in furtherance of that conspiracy, you are as liable for every other member of the conspiracy's act as if you did them yourself.  So that's why these drugs that were seized in Hawai'i from Mr. Honda are equally applicable to the defendants here and why they are equally responsible, as was Mr. Honda and the other co-defendants in this case.

Okay.  Let's go back to the elements again.  So the first element is was there an agreement between two or more persons in this case within that time frame to distribute and possess with intent to distribute methamphetamine.

Charles Ranney and Sheri Bulacan had an agreement to distribute and possess with intent to distribute methamphetamine.  As did Charles Ranney and William Caminos.  As did Charles Ranney and Francis Honda.  As did Charles Ranney and Michael Winings.  As did Charles Ranney and Joanette Quintal.  As did Charles Ranney and Guy Siaris.  As did Charles Ranney and Antonio Santos.  As did Charles Ranney and Joeann Tavares.  As did Frances Honda and Guy Siaris.  As did Francis Honda and Eric Shimomura.  As did Michael Winings and William Caminos.  As did Sheri Bulacan and Joeann Tavares.  As did Sheri Bulacan and Ronald Shim.  As did Sheri Bulacan and Joseph Chai.  As did Sheri Bulacan and Wayne Kila.  As did Sheri Bulacan and Marlene Ogata.  As did Charles Ranney and Marlene Ogata.

So there were agreements among all kinds of people to distribute and possess with intent to distribute methamphetamine.

But then, furthermore, there was an agreement between Miss Bulacan and Mr. Acuna, Miss Bulacan and Miss Valenzuela, Miss Bulacan and Mr. Olguin, as she testified to you about.  And we'll get into those details later.

There was a similar agreement between Mr. Ranney and Miss Valenzuela, Mr. Ranney and Mr. Acuna, Mr. Ranney and Miss Olguin.  Similar agreements between Joanne Tavares and the three defendants here.  Similar agreements between Mr. Melendez

and Mr. Olguin, Mr. Melendez and Mr. Acuna, Mr. Shim and Mr. Olguin.

So while they may contest their clients' involvement, I don't think even the defense will dispute that in this case there were many, many agreements among many different individuals to distribute and possess with intent to distribute methamphetamine.

So the first element is not an issue, I don't believe.

Secondly, did any of these three defendants become a member of the conspiracy, knowing of at least one of its objects and intending to help accomplish it.

Well, as you recall, there was a pretty set pattern and pretty tight procedure that this group -- that these conspirators followed.  The methamphetamine was obtained from Mr. Acuna or Miss Valenzuela with the assistance of Mr. Olguin, according to the testimony of Mr. Ranney, Miss Bulacan, Miss Tavares, Mr. Shim.  Those drugs would be packaged in a very precise, very specific way that you recall.  Recall Miss Bulacan was somewhat of a fanatic about making sure that every single package she received from the three defendants on trial here was the correct weight; so she would unwrap, with the assistance of her hired help, like Mr. Chai, Mr. Shim, reweigh it, make sure that it was a pound each, and then rewrap them in this system with the mustard, the Saran Wrap, the

vacuum-sealed food sealer bags, pack it up, and ship it to Hawai'i.

It was the network of customers here that initially Joeann Tavares had provided.  But then Mr. Ranney came to Hawai'i himself, set up shop in Waipahu, lined up all his contacts from previous -- his previous life here in Hawai'i, I guess, whether it be in the gambling scene, the drug scene, the bar scene.  Distribute the methamphetamine, collect the proceeds, send it back the same way it came via Express Mail.  The proceeds would then be sent to Seventeen Again, the front store owned by Miss Valenzuela.  It would be sent to Miss Bulacan, who would then deliver it to Mr. Acuna or Miss Valenzuela, or Mr. Olguin would come to her house and pick it up.  So that was, basically -- that was the system.

Why is that important?  Because it shows there was an existing long-term relationship.  The system that was in place.  Large amounts of drugs.  They trusted each other.  Regular shipments of drugs that were going.  Basically, Miss Bulacan told you as fast as she could get the drugs, she could get rid of it and distribute it here in Hawai'i.  They all depended on each other.

Why this conspiracy worked as well as it did for as long as it did was because these three defendants, Mr. Bulacan -- Miss Bulacan, I should say, and Mr. Ranney were somewhat unique in this subculture.  They weren't flakes.  They

were reliable.  As Miss Bulacan said, in the drug game you can hardly ever find anybody that's consistent.  That's why when Charles Ranney came, the light bulb went on, and she said, This is somebody that I can rely on, that I can use to move the amounts of methamphetamine that I want to move, that I know there's a market for in Hawai'i.

Likewise, she knew she could rely on these defendants to provide her with those large amounts of methamphetamine on a regular basis.  There was no one else in Las Vegas that she had found that could do that, until she ran into Mr. Acuna.  Other people tried to come and woo her business.  The word was out:  This lady buys 50 pounds at a time, hundreds of pounds a month.  But she said, no, she was happy with Mr. Acuna because everything was working, everyone was making money.  And that's -- there's one thing that drug trafficking is about:  It's money.  No matter what reason they say, the bottom line it's about money.  Money and the power it brings, the influence it brings, the control it brings.

There's two key words in this second element:  knowing and intending.  Knowledge and intent.  So how do we prove that any of these three defendants had the knowledge and intent that's required:  that they knew of the conspiracy's goals and they intended to help accomplish it.

Well, unless somebody tells you themselves, you can't read their mind; so you need to look at other things to

determine that.  You need to look at things the defendant said or didn't say, things that they did do or did not do, their overall actions.

Circumstantial evidence.  Circumstantial evidence is explained to you in jury instruction number 5, but I want to give you an analogy to explain, I guess, the difference between direct and circumstantial evidence and impress upon you that circumstantial evidence is not inferior evidence.  It is not a sort of secondary or lower quality evidence than direct evidence.

Prosecutors drives -- it's crazy what you see in the media.  You'll see on television where they say, Well, it's just a circumstantial case.  It's only a circumstantial case. As the instruction tells you, circumstantial evidence is every bit as powerful as direct evidence.  It's up to you to decide specifically in this case, but do not start with the mindset that it is somehow less powerful than direct evidence.

Let me give you an example.  So say last night you're asleep and you wake up because you hear something.  It turns out to be it sounds like rain on your roof.  So you go outside to get some fresh air.  You see the rain coming down. Actually, some rain starts to drip on you that's dripping off your eaves.  There's a streetlight right by your house.  You can see the sheets of rain coming down.  That would be direct evidence.  If you were called to testify at some trial, they

say, Was it raining last night when you got up?  Yes, it was. I saw it raining.  That's direct evidence.

Circumstantial evidence would be if you hear that same sound that wakes you up, but you're too tired; so you roll over.  You don't fall asleep right away, but you hear thunder, you hear the rain hitting your -- what sounds like rain, anyway, hitting your roof harder.  You fall back asleep.  You get up in the morning.  Your grass is all wet.  Your sidewalk is wet.  You go out to get your newspaper.  It's in a plastic bag on that day.  The plastic is wet.  You look up in the sky. The sun's coming out.  Maybe there's a rainbow.  You didn't see it rain the night before, but you are every bit as sure that it rained in the middle of the night when you woke up, as if you had gone out and seen the rain.  So that's an example of direct evidence versus circumstantial evidence.

So in this case, starting with Mr. Acuna, what is the evidence we have to show that he became a member of this conspiracy, knowing of at least one of its objects and intending to help accomplish it?

Well, obviously, first of all, we have the testimony of the people that dealt directly with him.  Sheri Bulacan, Charles Ranney, Joeann Tavares, Luis Melendez, all testified that he was the person that they received drugs from.  Large amounts of drugs.  Large amounts of methamphetamine on multiple occasions.  That he was the one who received money, drug

proceeds, in return for those drugs after they were sold here in Hawai'i.

Mr. Chai testified that he, from hanging around Sheri Bulacan's house and packaging all the drugs that he did, he testified he probably mailed 15 packages anywhere from 75 to 125 pounds each of methamphetamine, that Miss Bulacan had said Benny was her source of drugs. He said he didn't know who he was, though. However, when he came into court, he said, Now that I'm in court, I recognize him. He said, As usual -- he explained on that particular instance he was asked to leave the house, which meant the drugs were coming. "Joe, leave. Go get the packaging stuff." When he would come back, the drugs would have been delivered. Well, this time Mr. Acuna arrived before he got there; so when he left, he saw Mr. Acuna, and he identified, Yeah, that's the person I saw coming to Sheri Bulacan's house when she said -- told me the drugs were on their way.

Michael Winings never saw Mr. Acuna, but again it was a similar kind of situation. Remember there was the fairly comical story that he -- he told us about his time in Washington and then how he was in trouble with Mr. Acuna. He -- he couldn't be allowed to be known that he was at Charles Ranney's house or with Charles Ranney because of it. So Charles would say, Hey, you got to hide, go leave the house or hide up in the bedroom. Benny's on his way. He would see the

Chevy Tahoe pull up.  He'd hide.  After he -- the person who had arrived would leave, Charles would say, Okay.  It's time to come out.  You can come out.  And then what would Michael Winings get?  The thing he was waiting for:  his drugs.  To fill up my bowl, as he would say, with methamphetamine because he was the tester.  Because Charles Ranney didn't do methamphetamine.  He said they didn't have any, they were out, until Benny showed up.  After Benny had come and gone, after Mr. Winings came out from his hiding place, there would be drugs.  And that happened on multiple occasions.

Same thing with the money deliveries.  Charles would say, Hey, come with me, roll over to Sheri Bulacan's house with me.  I've got to -- we've got to deliver these drugs to Benny guys.  So he'd have to hide in the truck or Mr. Winings had tinted windows, apparently, and he'd show him a bag full of money -- duffel bag full of money that Charles Ranney would take into -- into the house.  He'd come out with another bag with drugs, and Charles would, I guess, sometimes say, Hey, you ever see a pound of dope, Mike?  Show him a pound of methamphetamine.  And again Michael Winings got to test it.  So again corroborates what the other individuals told you about Mr. Acuna being a drug source.

We talked about the large amounts of drugs, the standardized routine that they had for shipping the drugs, the frequency of the shipments.

Another factor that shows there was this long, ongoing trusted relationship was that these drugs were fronted. Remember "fronted" meant that they didn't have to pay for them upfront.  Now, these shipments were anywhere from -- they varied according to the testimony, but anywhere from 10 pounds, 20 pounds, up to I believe Miss Bulacan said the largest shipment she received at any one particular time was 40 pounds, 45 pounds, somewhere in that area.

She also told you she paid Mr. Acuna and Miss Valenzuela, Mr. Olguin, 10,000 to $12,000 per pound.  So even at 10,000 per pound, we're talking hundreds of thousands of dollars that these defendants were willing to entrust to Miss Bulacan and Mr. Ranney, knowing that they would get paid back because that's what they were known for.  Sheri Bulacan and Charles Ranney always paid.  They always paid on time. They would pay and they would get more drugs, and the circle kept going.

And we know Mr. Acuna was the benefactor and the recipient of all this money.  He was seen driving, you know, these -- a number of these vehicles that we know that his wife Anabel bought:  The Escalade, the Tahoe, the Silverado truck. And there were two Silverado trucks:  one that they bought and then traded in later for a newer model.  He was living in these houses that were purchased:  Tuscadora, Midnight Cowboy, Ringe Lane.  We'll get to the -- the money issue a little bit later.

But he was, obviously, aware where was this money coming from?  He couldn't have been blind to it.

Another series of evidence we have here to show Mr. Acuna's knowledge, and this -- when you view this -- or view this evidence and talk about it, you should do it in conjunction with jury instruction number 11, and that's the one that said that this evidence should be viewed only for knowledge, lack of mistake or accident.  What I'm talking about is the -- of course, the May 2002 arrest of Mr. Acuna at Saylor Way.  Saylor Way, the house where 188 grams of methamphetamine was found in the house, where $140,000 in cash was found in the bedroom that Mr. Acuna told the Las Vegas Metro detectives that he stayed in, even though he tried to deny it when he testified, saying that I said yes, yes, yes to all their questions because they were covering my face, or whatever he said.

So he test -- or he told the officers at that time that he paid the rent at that house.  And lo and behold, four days after that search warrant is served, when they serve the search warrant at his parents' house, the same brand new furniture that was at the Saylor Way house appears in the Jensen house.  Of course, Mr. Acuna has this explanation as to, Well, that was some other guy's who I agreed to let him store at my house.  And we'll talk more about the credibility, specifically of Mr. Acuna, in a little bit.

The $140,000 in cash was found in a shoebox, which we've heard a couple of times in this case about large amounts of cash in shoeboxes.

Aristoteles Acuna, his brother, who's the straight and narrow in the family, who's held the same job for 10 years and attends Bible study, apparently, and helps his mom and dad out around -- with the rent. And he's there at the search warrant at Jensen, his parents' house, and is very cooperative with the police and tells them, Yeah, my brother's a drug dealer. He sells large amounts of drugs. In fact, I'll take you over to an apartment that's vacant that he hangs out in that he uses in this building that we're partners in, if you want.

Okay. So Metro goes over there, and what do they find? It's evidence of a storehouse. 51 gallon bags, capable of carrying a pound of drugs, in the garbage and strewn on the floor in a place that had very little, if any, furniture in it; that the detectives testified it was -- it didn't appear that anyone was living there, it was ever housed or equipped for anyone to be living there. And that there was enough residue left in these bags that they collected it and came up with 20 grams, which was worth -- you know, I can't recall the testimony exactly, but a thousand bucks or 1500 bucks or something, that, basically, had just been left behind, didn't care about it because signifying a much larger amount had been

there very recently.

Then they go to the Phantom Jet apartment where the power is in Anabel Valenzuela's name, where there are items found there belonging to her, photos of her and Mr. Acuna. Mr. Acuna admitted on cross-examination that he spent a lot of time there, hung out there. They were boyfriend/girlfriend at the time he was over there. But couldn't give any explanation as to how the Tupperware containers where the detective scraped out I believe it was 1.7 what they believed to be methamphetamine. The DEA chemist who testified tested the residue, and it tested positive in those Tupperware containers. All of this tells you that Mr. Acuna was well into the drug game in at least May of 2002 at the latest.

Of course, it was before that because Miss Bulacan indicates she met him earlier than that when she made and struck this deal with her previous supplier, Mr. Moheatau, where she paid off his debt so Mr. Acuna would be satisfied and call off the dogs, so to speak, if she could deal directly with Mr. Acuna because, as she testified, she wanted to go right to the source. She didn't want to mess around with the middleman. She wants to go to the people that could give her the big amounts that she needed. Mr. Acuna, Mr. -- Miss Valenzuela, Mr. Olguin were those people.

Similarly, Luis Melendez, he corroborates exactly what Miss Bulacan, Mr. Ranney, Miss Tavares told you. Remember

Mr. Melendez had nothing to do with this conspiracy, didn't know anybody from Hawai'i, said he never met anyone from Hawai'i the whole time he lived in Las Vegas, never been to Hawai'i, he didn't know any of people when we named off the names for him.  Yet, what does he tell us?  Same exact things that we heard from Sheri Bulacan and Charles Ranney and the rest:  Benny was the person that he went to get pound quantities of methamphetamine from.  That after he dealt with Benny, initially, he dealt almost exclusively with Eddy Olguin.  Just what Charles Ranney told you.  That after a while, after they got their system right and things were going smoothly, Sheri Bulacan kind of stepped back, let Charles Ranney run things.  Exactly what Miss Valenzuela and Mr. Acuna did with Mr. Olguin was -- Mr. Olguin was the equivalent to Mr. Acuna as what Charles Ranney was to Sheri Bulacan.  They were the ones running the day-to-day operations.  And that's who Mr. Melendez indicated he dealt with almost exclusively a few months into the -- the time period that he began picking up drugs and dropping off money on a regular basis to Mr. Acuna.

Investigators in Las Vegas were fortunate enough, I guess, or sharp enough, probably a combination of both, to find in a report or an interview that Mr. Melendez had given that he made a reference to a Benny that he dealt with.  So a year -- over a year after Mr. Melendez is arrested they pull him out and say, Hey, tell us about this Benny.  And he gives all the

information that you heard.

Mr. Melendez then gives directions.  He says, Well, this is how I would get to Benny's house, coming from his boss's house, who was a person named Manuel Martinez.  So the agents they take the directions, they follow them from Manuel Martinez's house, and they go and they find this house on Little Lake.  They run the power check, the utility check for those dates where Mr. Melendez said he went to there.  Who's the power is the name in?  Anabel Valenzuela.

That's police work at its best.  And it corroborated not only what Luis Melendez said, but then what Luis Melendez told you corroborated exactly what Mr. Ranney, Miss Bulacan, and the other cooperating defendants told you.

But Mr. Melendez also said, Well, I know that Mr. Acuna and Mr. Olguin drove Silverado trucks, which they did.  The DMV records are in evidence.  You have those.  He said that, I took money to Seventeen Again.  Again exactly what we'd heard previously from Charles Ranney, Sheri Bulacan, and the other cooperating defendants.  He knew about Sin City Wireless.  He'd been to Sin City Wireless on at least an occasion or two.  Again precisely corroborating what an entirely independent, distinct, and separate group of people said, Luis Melendez had the same account as to what Mr. Acuna, Mr. Olguin did.

And Mr. Melendez never dealt with Miss Valenzuela, he

said, and we'll talk about her in a minute, but he said he did recognize her, he did see her at the Little Lake house when he would take money there or pick up drugs.

Now, the credibility of witnesses is, obviously, an important part of your deliberations in this case.  You have to decide what witnesses were telling the truth, which witnesses weren't, what portions of their testimony were truthful, which portions were not.

Jury instruction number 6 goes through those various factors.  The opportunity to observe or acquire knowledge.  Well, in this case the government's witnesses, cooperating witnesses, Mr. Ranney, Miss Bulacan, Mr. Chai, Mr. Shim, Joeann Tavares, they're right there.  They're all right in the thick of it.  They have a unique perspective and a unique ability to say what was going on inside the conspiracy.  Nobody outside the conspiracy is going to be able to give you that kind of information.

Now, are -- do those witnesses have their own issues?  Of course, they do.  Are Mr. Winings and Mr. Ranney thugs?  Yeah, they were thugs.  Was -- did Miss Bulacan and Miss Tavares have drug addictions?  Absolutely.  Did they, apparently, appear to have gambling addictions?  Looked like that, too.  The government doesn't choose its witnesses.  And the next time I see a Eagle Scout or a civic leader involved in one of these conspiracies will be the first time, but you don't

get anybody involved in these types of cases but the people that you heard from today and earlier in this case.

Does that mean that they could not be telling the truth?  And there was some cross-examination that was attempted to get that when Joeann Tavares very candidly said, Yeah, I -- I lied all the time.  I'd do whatever I could to get drugs because all you care about when you're doing drugs is getting more drugs, is getting high more.  The selfishness that I talked about.

Does that mean that you can't tell the truth ever about anything?  I don't think so.  Do you have to look at other things to make sure that they're telling the truth?  Absolutely.  Should you take any of their testimony at face value?  No.  You should look at what other witnesses said, whether there's independent corroborating witness or testimony or evidence.

You have to consider the witness' memory.  And I'll touch on that issue for a moment.  If you think about how many drug deals were done and how long it was done, I think you'll agree that the witnesses' -- the government's witnesses' memories were very good about the details in those things.  Were they good about specific dates?  No, they weren't good about specific dates.  But we had witnesses like Ronald Tosh come up, who wasn't really -- couldn't even remember exactly what year he retired in or what year that he had worked for

Citibank.  So that's not unusual for people not to have specific dates right at their fingertips, especially when, as I had pointed out, and Miss Bulacan acknowledged, every day was the same.  Every day was we get high and we gamble, and whatever else they did to waste their time.  Nobody was going to work.  Nobody had any real responsibilities that they were doing, other than moving the drugs.

The witness' manner while testifying.  That's something that you should consider as well.  Did they appear to be holding things back?  Did they appear to be not being forthright or upfront with you?

Their interest in the outcome of the case.  Each of these three defendants, obviously, have the highest interest in the outcome of the case.  The stakes are highest for them than anybody else by far.

Did testimony support or contradict their testimony?  Again the example Luis Melendez supported Sheri Bulacan, Charles Ranney, Joeann Tavares.

Reasonableness in light of all of the evidence.  Mr. Acuna tells you that he earned sometimes over $20,000 a month in under-the-table income on his construction work.  But I said, Well, what was your best year?  Well, I don't know, I never kept track.  I said, Well, you must have kept track if you know you made over $20,000 a month.  Yeah, well, I don't know, I don't know, I didn't keep track.

But when I asked him this variance that we'll talk about more later, but the variance that Agent Mickelsen talked to you about after he did his financial analysis and showed that there's almost $900,000 in unexplained deposits into the accounts by Anabel Valenzuela, as opposed to what was reported on the tax returns.  I asked Mr. Acuna, So that $900,000 over this five-year period, that all came from your construction work under the table?  Yeah, he said.  So he made $900,000 in five years as a construction worker in Las Vegas.  Is that reasonable?

Was the defendant or the witness impeached is another factor that you should consider.  Now, if you recall, Mr. Acuna, when he started off his testimony, he admitted he's violated the immigration laws multiple times.  He's violated the tax laws by not filing tax returns for any of the years during this period.  He admitted distributing drugs to Sheri Bulacan.  But he says never did it before, never done it since; that the reason he went and got drugs on her behalf for the first time in his life and distributed them to her was so that he could get this $12,000 side job from her.  Is that reasonable?

That he was so obsessed, apparently, about this job that he had his wife call from jail -- when he was in jail had his wife call on his behalf to let Miss Bulacan know, Make sure that she knows I'm not ripping her off, you know, I'm not

running away with her $2500.  I'm just in -- I'm in jail; so I can't do the job.

So after he gets out of jail and is deported, he comes back from Mexico, and, basically, his first visit back to Mexico is right to Sheri Bulacan's house, 17 months after they supposedly had this discussion, to say, I'm ready to work.  Is that reasonable?  Does that make sense?

And he wants you to believe that Miss Bulacan, who stewed and steamed for five years over this $2500 that he gave her, that when she was arrested, she said, Ah, this is my chance now to get Benny Acuna back for that 2500 bucks he ripped off of me.  Forget about the $2 million that I spent on Joeann Tavares over the last few years.  I don't care about that.  But that 2500 bucks, he's going to pay.  Is that reasonable?

The evidence is clear that Mr. Acuna not only was a member of this conspiracy, he was the top dog.  He ran the show.  When he went into jail in 2002, he turned over the operation to his wife Anabel, who took it to a new level -- we'll talk about that later -- with the money laundering.  But when he got back, when he got back in the United States, they had the meeting with Sheri Bulacan, "I'm back.  I'm running the show.  I don't know what you guys had going on before, what disputes you guys had, the $60,000.  It's done.  We're starting over.  We're starting fresh."  And they started making money, a

lot of money.  And we'll get into that in a minute.

Let's turn to Miss Valenzuela.

THE COURT:  I wonder, Mr. Inciong, if this is a good time to take a short break.

MR. INCIONG:  That's fine, Your Honor.  That's fine.

THE COURT:  Okay.  10 minutes.

(Jury excused.)

THE COURT:  Okay.  I'll see everyone in 10 minutes.

Just so you know, we made a slight correction on the verdict forms.  The verdict forms that everybody agreed on actually had a signature line that said "Foreperson, grand jury."  So we just are whiting out the "grand jury."

MR. INCIONG:  I apologize, Your Honor.  Sorry about that.

THE COURT:  Anyway, I'll see you folks in 10 minutes.

(Court recessed at 10:29 A.M., until 10:43 A.M.)

THE COURT:  Okay.  Mr. Inciong.

MR. INCIONG:  Before I begin to talk about Miss Valenzuela specifically in regard to count 2 -- I'm sorry. Element 2 of the first count, the conspiracy to distribute and possess with intent to distribute methamphetamine, I just want to follow up in regard to one of my last comments in regards to Mr. Acuna.

This idea, I guess, that Sheri Bulacan would set him up and harbor this vendetta against him over $2500 for all that

time is, obviously, not reasonable on its face, but if you think about what Miss Bulacan's possible motive would be to do that, remember she and Mr. Ranney, Miss Tavares, they pled guilty in this case.  And they explained to you, just as the other cooperating defendants did, that they're all hoping for a reduced sentence, but they also understand there's no guarantee of that.  You also heard the sentences that Mr. Ranney and Miss Bulacan specifically are facing.  So they recognize and they indicated to you their only shot to reduce their sentence from the very long ones they are looking at is to truthfully provide substantial assistance:  by naming their sources of supply, for example.

So why would Miss Bulacan risk, or Mr. Ranney or any of the other defendants, risk naming someone falsely as the source in order to get this reduced sentence when they could get the reduced sentence by naming the true source?  There's nothing to gain.  They would be getting the same exact benefit either way.  So to suggest that they're going to risk not getting any benefit at all again to frame Mr. Acuna over a $2500 debt is preposterous as well.  So I want you to think about that.

Now, in regard to the cooperating defendants, there were a number of them:  Francis Honda, Michael Winings, William Caminos, Joanette Quintal, Joseph Chai, Ronald Shim, Charles Ranney, of course, Luis Melendez, Bobbie Jean Asuncion, Joeann

Tavares, Sheri Bulacan.  Now, a number of those witnesses were called to establish that there was this conspiracy, like we talked about for the first element.  We're, obviously, going to focus more on the witnesses that specifically dealt with and had direct contact with the defendants here on trial, but all of them accepted responsibility for their roles in the conspiracy, pled guilty.  They were hoping for reduced sentences.  Some of them have already received reduced sentences for the substantial assistance that they've provided.

But again they're all right in the thick of it and they all gave details that there's no other way that the government would have found out about.  They admitted things that the government would have never known.  The best example probably is Francis Honda.  If Francis Honda had not told the agents who arrested him that he had this 35-pound box at his friend's house, the likelihood is that box would have never, ever been discovered.  If he wouldn't have said, Charles Ranney was my source, maybe at some point Charles Ranney would have been found out, but if not for Francis Honda, none of that would have happened.  If not for Francis Honda, the 20 or so defendants that was testified to that have been arrested and prosecuted as part of this case wouldn't have happened.  So that's another thing you need to think about is the candor of these defendants and the things that they volunteered and they told as part of their cooperation is, I think, another useful

thing, another thing to show that they, in fact, are being truthful.

Now, we talked a little bit about who has the highest stake, who has the most motive to lie in this case.  Obviously, no one will disagree it's the three defendants on trial here.  But to give you an example, the last thing that you heard from the defense was a stipulation that Mr. Singh read where Francis Honda received an early release.  He was released about a month early or so from prison based on his cooperation.  So, obviously, the outcome of this case had no bearing on whether Francis Honda got a benefit because the trial was still in progress.  So again the ones who have the most motive, are facing the highest stakes, are these three defendants, and that's something that you must consider in weighing their credibility.

Now, in regard to Miss Valenzuela, what evidence is there against her that she became a member of this conspiracy, knowing of its goals and intending to help accomplish it?  Well, again much of it is the same evidence that we already talked about with Mr. Acuna.  Sheri Bulacan, Charles Ranney, Joeann Tavares all indicated that they gave her money, received drugs from her, that she took over the business for Mr. Acuna while he was in jail.

And the other thing I want to point out, too, is that all of these witnesses were consistent with each other.  All

the various government witnesses corroborated each other, whether it was Francis Honda to Charles Ranney, Francis Honda to Sheri -- or not to Sheri Bulacan, Francis Honda to Guy Siaris, Francis Honda to Eric Shimomura.  Luis Melendez, as I mentioned before, to Miss Bulacan and Mr. Ranney.  They all corroborated -- they all corroborated each other.

And that's the other, I guess, prong of the defense here that just doesn't add up.  For Mr. Acuna's story to be true, basically all of these cooperating defendants, ranging from Charles Ranney, who was arrested in September of 2005, to Joseph Chai, who was arrested in May 2008, almost a three-year span and everybody else arrested in between, at some point somewhere, somehow they all got together and all got this same script to all point out and blame Benny Acuna, Anabel Valenzuela, and Eddy Olguin falsely.  How could that have happened?

Mr. Ranney was arrested in 2005.  Miss Bulacan gets arrested two years later and gives the same account.  Miss -- or I'm sorry.  Miss Tavares gets arrested later in 2007, gives the same account.  Luis Melendez, who's arrested in 2005, gets interviewed in 2006, who doesn't know any of these people, gives the same account.  Joseph Chai is arrested in 2008.  He corroborates what they say.  So all the witnesses corroborate each other.

There's also independent corroboration.  And I won't

go through every single thing, but if you recall when I called Officer Peralta back at the end -- toward the end of our case and had him kind of summarize, and he gave an example or two how each of these defendants -- cooperating defendants' testimony was corroborated with the -- for example, the Express Mail labels, corroborating Francis Honda what he had said how they got the mail.  That corroborated Charles Ranney's story that he had mailed these parcels to Antonio Santos, which they found the labels for.  To Michael Winings, which they found the labels for.  Ronald Shim, who said this drug deal went down at the Hilton Hawaiian Village.  We find there's hotel records for that.  There's the DMV transfer of the car for Joeann Tavares when she said that she, basically, bartered that car, traded it for a drug debt.  Of course, the defendants have their own convenient explanation for that, which I'll talk about later. So there's not only corroboration by other witnesses but independently as well.

Now, we have, basically, unlimited -- I could talk for the next three hours.  I won't -- about the financial evidence against Miss Valenzuela in this case.  Basically, the highlights are the 898,000-plus dollars in unreported, unexplained income over this five-year period.  $660,000 in cash deposits over this five-year period.  Over a quarter million dollars of cash expenditures.  And that was just from 2004 to 2006.  That includes, of course, this grocery bag of

$50,000 in cash to pay Robert Langford.  The $28,000 in cash in the shoebox that she took to Extreme Auto to buy her Mercedes-Benz.  So if you take the cash deposits and the cash that she spent, that was $890,000 in cash available to her during this period.

Now, remember, that only includes what was able to be traced by large transactions like the one for the car and the attorney and what was deposited into the bank.  Don't think for a minute that they deposited every single dollar they had from the drug proceeds in this case into their bank accounts.  Look at how much money Charles Ranney and Sheri Bulacan made.  In the six months or so when she first moved Charles Ranney out to Hawai'i to set this whole thing up, they each made a million bucks.  Sheri Bulacan spent two million bucks on Joeann Tavares.  I mean millions.

They're at the top.  They're above them.  They're the source.  They, obviously, had other customers, like Luis Melendez's group, that they were providing methamphetamine to, which we're not even including in all of this.  Who knows how much money went down to Mexico on all these trips that they're talking about when they went back and forth to Mexico.  Who knows how much money is in this secure retinal facility that nobody can get into, unless you put your eye in front of the scanner.  That's just what we know about.  It's the tip of the iceberg.

Now, again Anabel was the recipient and benefactor of all this money, driving all these vehicles at one point or another, buying these houses.  Again the Phantom Jet search.  Again this was introduced to show there's no mistake or accident here.  It's to show her knowledge.  She couldn't give any explanation whatsoever.  She's, basically, dumbfounded.  She had no -- no explanation for how these Tupperware with the drug residue got into her apartment that she lived in.  It was there.  Bet you she and Benny were already selling drugs at that point in time.

She couldn't explain when Miss Connors asked her over and over and over again, Where did the money come from?  Well, I'd have to see my bank statements.  I'd have to see my bank statements.  Well, as was pointed out, her -- her attorney was the one who made the point that you can't tell from just looking at a bank statement what the source of the cash was for a cash deposit.  You have to look further than that, if you can find it at all.  Couldn't explain.

Finally, she said, Well, must have come from the store, despite that the store lost over a hundred thousand dollars between 2002 and 2006.  Then she kind of changed her story, said, Well, you know, the money came from my husband's construction work.  But remember initially she had said Benny saved all his money and cash at home.  Then it changed a little bit, Well, we had to deposit some of it because I had to pay

bills. Then it changed to, Well, we had to deposit most of it because I had to pay bills. If there was one thing that you noticed that I'd ask you to think about from Miss Valenzuela's testimony was that it was constantly changing. She would always adjust it just a little bit, you know, so she would get out of the corner that she had painted herself into. And that was just one example.

Miss Valenzuela admitted mortgage fraud, lying on loan applications, forging other peoples names, admitted she broke the tax laws. But she always had an explanation or tried to give an explanation as to why she did it. But if you recall at one point when she was talking about one of the loans, I believe it was the Enchanting Court loan application, she said, Well, I had to lie to get the loan.

Again this goes to the -- the sense of entitlement that money poisons people with. You see this particularly with young people who come into a lot of money quickly. Athletes, musicians, celebrities. They think they're the most important person in the world. They think that they're entitled to things. It's no different with drug dealers. They just -- you just don't know about them because they're not on "Entertainment Tonight" or whatever show you're watching, ESPN. It's the same thing. It's this entitlement, Well, I had to lie. Why? Because she was entitled to that loan. It never crossed her mind that, well, maybe I just can't qualify for it

or don't qualify for it, if that was really what she was intending to doing.

Miss Valenzuela also testified that she started Seventeen Again with -- and that amount changed, too.  First, it was $15,000.  Then it was $12,000.  I think the final number was $10,000 that she had saved from working as a teenager.  $30 a day selling fruits and vegetables, then later $6 an hour, and by the age of 19 she had $10,000 or $12,000, or whatever her final answer was, saved to start this business.

Is that reasonable, if it was $12,000 at $6 an hour? That's 2,000 hours she worked at some point.  And that's not including withholding, taxes, money that she would spend from it.  Is it reasonable to think that with those jobs she had she could have saved $12,000?  Or is it more reasonable to think that that money came from the drug business they were already in?

Now, she testified that she bought the Stewart apartment building right out of high school:  $190,000 apartment.  That she didn't have to put much money down for that.  But that, of course, that was different than what Aristoteles had said.  Aristoteles had said it was 10,000 bucks that they had put down and he had -- he had provided one. Miss Valenzuela testified it was $5,000 and she had provided maybe half of that.  Where's all this money coming from for someone right out of high school?

Remember she testified in regard to the Enchanting Court that she didn't have money for the 10 percent down or for closing costs.  But yet in that year there were $256,000 in deposits into her bank accounts.  When she was asked about it, then she tried to change her story again and said, Oh, no, that's not what I said.  I said why would I do that because that house wasn't going to be for me; so why would I pay the closing costs?  Changing her story again when she's caught.

She testified that she bought Ringe Lane, the house there, because the Midnight Cowboy house was too expensive.  So again that makes no sense whatsoever.  She owned at that point four houses, making the payments on four houses.  So Midnight Cowboy is so expensive and she's having such a hard time making ends meet, that now we're going to buy another house, a fifth house, with another mortgage and more payments to make on it.

I couldn't live in any of these other places.  She had an explanation for all the other houses.  She couldn't rent.  It doesn't make sense.

The only thing that makes sense is what Agent Mickelsen testified to.  He said knowing what he knows about the investigation and looking at the financial documents, there's only one explanation:  Drug proceeds is where all this money came from.

She was asked about the stated loans, you know, everybody was doing it, everybody was puffing and exaggerating

and putting these inflated values on stated loans.  Even if that was true, it was interesting that she wouldn't really answer the question when she was asked because she had started to say, Well, for a construction worker, you know, it has to be reasonable.  You couldn't put X amount for a stated loan for a construction worker.  So Miss Connors tried to get her to say, Well, how much would that be?  What would be reasonable or what would be unreasonable for a stated loan for a construction worker?  And she wouldn't answer it.  Well, it would depend upon what kind of work.  She kept saying it would depend upon what kind of work.  Because she knows that $23,000 a month, which is what her husband said he had made, would not be reasonable.  Nobody would believe that.  On a loan application or anywhere else.

She testified that she was calling Mr. Langford, who she had hired in December of 2004, in the fall of 2005 in regards to that case.  So that's just purely a coincidence that she'd hired him almost a year later, but suddenly she had to get ahold of Mr. Langford and was calling him repeatedly, when he just happens to now be representing Charles Ranney.  In reality she wanted to control what was going on; she wanted to know what was Charles Ranney doing.

She testified she made no money at these carnivals, just like Mauricio Bahena said:  no money was made.

But the other thing I think that was significant from

her testimony, if you recall, basically, everyone else is lying, everyone but her.  Las Vegas Metro, they're lying about what they found.  Sheri Bulacan's lying.  Charles Ranney is lying.  Joeann Tavares is lying.  Luis Melendez is lying.  Mauricio Bahena is lying.  Robert Langford is lying.  Ronald Tosh was even lying.

Ronald Tosh testified that he repeatedly asked her for bank statements, any bank statements, we have to do this, bank statements, and just gave up because she wouldn't ever give them to him because she didn't want him to see.  She knew if anybody was going to question that and see something wasn't right, it was an accountant who had been doing her books, seeing that she was losing money, telling her she needed to move to a new location, but then there's deposits of hundreds of thousands of dollars?  She couldn't show him that.

And then she says, Oh, well, Joeann Tavares, who maybe I met once before, she shows up at my shop and asks me, Do you want to buy my Mustang?  That's her explanation for how the Mustang ends up in her -- her mom's name.  And that was the other part of it, too; right?  Oh, we had to do it because I couldn't get insurance and again all these coincidences.

But that's part of what the whole lesson here is.  When you go back into the jury room and deliberate, you have to consider everything that you've heard and what the -- the legal term is the totality of the circumstances.  Defense, they can

explain away anything.  They can come up with a story for anything, if you talk about it individually.  Well, this is why I bought the car.  This is why it wasn't in my name.  This is why this.  This is why that.  But if you put everything together with all the testimony that you heard, what all the cooperating defendants said, along with the financial analysis, there's only one conclusion that can be reached:  The same one that Agent Mickelsen reached.

Now, Mr. Olguin.  Now, don't underestimate or forget about Mr. Olguin because, like I said, at the -- at the end when this conspiracy was at its peak, he and Mr. Ranney were the two in charge.  They were the ones running the show because this was a well-oiled machine at this point.  So he's responsible for hundreds and hundreds of pounds, if not thousands, himself that he handled during this time.  Sheri Bulacan, Charles Ranney, Joeann Tavares, again all I.D. him as being involved, as does Luis Melendez.

Ronald Shim talked about the whole -- the video surveillance system and the blue Mustang.  And the blue Mustang, the dates -- if you look at the records when you go back and look in the evidence, the dates bear out Joeann Tavares didn't have that car after 2003 or '4.  Eddy Olguin had it shortly after Anabel Valenzuela bought it.  He saw him coming out of that car.  Did he look at him every single time?  No.  Joeann Tavares said, Did you ever see that car again, much

less drive it?  No, I never saw the car or drove it again.  He did the deal with him at the Green Valley Ranch parking structure where Ronald Shim was ticked off, to say the least, that he was being asked to go and take this drug shipment out of the house in an open public place like that.  He testified he met Mr. Olguin there.  They made the exchange.  Mr. Shim was ticked off enough about it that he went in and ate Chinese food while the suitcase sat in his open bed of his pickup truck.  He didn't care what happened to it.

Mr. Olguin was paying 730-some dollars a month for his car payment.  This is someone who, if you look at his tax returns, never reported more than $20,000 in taxes in any single year during this period.  He was also paying his mom $900 a month in rent.  So $1600 a month alone for those few things would eat up his entire paycheck.  Did he eat?  Did he buy clothes?  Did he support his kids?  How did he do that without other income?  Where did the income come from?  Well, defense is going to say it was, you know, this whole under-the-table construction work on the side.  But Karla Soto told you, when she dated him, he drove some rundown car, and the next time she saw him he was in this -- in this lifted nice new Silverado truck, the one he's paying 730-some dollars a month on.

So it's clear each of these three defendants not only were members but were leaders, organizers of this conspiracy.

As the testimony came out from Mr. Ranney in particular, but Miss Bulacan as well, and this isn't something that needs to be proven, but they knew full well that the drugs were going to Hawai'i.  And Mr. Shim talked about that, too, because there was this lag that they had to wait for the money as the drugs got shipped to Hawai'i, the money would take a week or so to come back, and then they could pick up the money.  Mr. Ranney talked about how he was, basically, coming up with excuses to tell them, no, they couldn't come to Hawai'i because he knew, if they came here, they were going to, basically, bump him out because they knew or had an inkling at least that there was a lot of money to be made here.

Let's talk about count 2 -- I'm sorry.  Count 3.  The money-laundering count.  The language is a little bit different, but the elements are, basically, the same.  It's again two persons or more agreed in some way here that they would conduct financial transactions with the proceeds, the drug proceeds, from the count charged in count 1, with the intent to promote the carrying on of the unlawful activity or knowing that the transactions were designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity:  drug trafficking here.

And, secondly, again the same second element.  The defendants became members of the conspiracy knowing of at least

one of its objectives and intending to help accomplish it.

Again count 1 we've got agreements galore.  Sheri Bulacan, Charles Ranney -- I won't go through it, but it's the same -- the same people were involved.  Because, as you recall from Agent Madinger, in particular, and also Agent Mickelsen, I believe, there's this kind of mystique or misunderstanding of money laundering.  You hear money laundering, you think, oh, it has to be this, you know, very complicated thing.  And if it's done correctly, it is.  But it can be in very, very primitive and crude forms, such as in this case where the drugs were going to Hawai'i, money was coming back, money was coming back to conceal the source, to be disguised as to who owned it, who controlled it.  It was also being brought back to further promote the conspiracy:  to buy more drugs.  It's a two-way thing.  It doesn't work if one stops.  The drugs have to keep coming; the money has to come back to buy more drugs.  That's the way it worked.  So without even getting into these financial transactions, which we're going to get to briefly, that Miss Valenzuela engineered, money laundering was committed right there.

Three defendants were in Las Vegas.  They sent the drugs here to Hawai'i, using Sheri Bulacan and Charles Ranney as the go-between:  two former Hawai'i residents living in Nevada.  They had their network that was set up there.  Bobbie Jean Asuncion, William Caminos, Francis Honda, Wayne Kila,

Marlene Ogata, Joanette Quintal, Antonio Santos, Brandon Suan, Joeann Tavares, Michael Winings, Brandon Yamamoto.  They all, basically, did the same thing:  they were distributors, money collectors.  They sent the money back either to Seventeen Again, to Sheri Bulacan, who would then give it to Mr. Acuna or Mr. Valenzuela, or Mr. Olguin would come pick it up.  More drugs would be purchased or fronted, delivered, and sent back to Hawai'i.  And the same thing over and over and over again.

Some of the money went into Anabel's bank accounts: Washington Mutual, Bank of America.  She used some of it to buy Enchanting Court.  That number is the amount of the down payment, closing costs, and mortgage payments that she made that came out of her accounts.  Tuscadora Court.

And the purchase prices are shown on here, and I want to just address that briefly.  Mr. Flores took exception to us saying that, well, these houses together were more than $2 million.  If anybody thinks that I misled them to think that that was paid all in cash in full, I apologize.  I think it was -- I hope it was clear that's not what I was referring to, but, when we buy a house, that's how you refer to it.  You don't refer to say -- if you've made a $20,000 down payment, you don't say I bought a $20,000 house.  You refer to what the purchase price is.  Did you pay it all at once?  No, hardly ever.  Maybe some people do occasionally, but, normally, you get a mortgage.  You're going to pay that amount and a lot more

in interest over time.  So that's simply the way I was referring to it.  You buy a house at the list price.  The agreed-upon price is $500,000.  You tell people, My house costs $500,000.  That's all that was being referred to.

Benicasm Court.  This was starting August of '04.  November of '04 was Tuscadora.  February of '05 is Benicasm Court.  Midnight Cowboy is October of '05.  And then Ringe Lane, June of '06.  That's roughly $300,000 or so right there.  Then there were the vehicles.  Another 135,000 almost in vehicle payments.  So over $400,000 on mortgage payments, closing costs, down payments, and vehicle payments during that time.

I'm not going to go into any great detail because that was done during the case in chief, and I'm sure you recall, but, you know, the manipulating that Miss Valenzuela did to obtain loans, forging names, persuading her co-workers to do things for her.  You heard Mr. Alamillo said, Were you willing to do this for her, knowing that, you know, you weren't following the rules of a notary?  You're supposed to have someone there in front of you sign.  He said, Yeah, I wasn't really comfortable with it, I didn't want to do it, but she was, like, "Come on, come on, come on.  Just do it."  That was his -- so he did it.  Same thing with Karla Soto.  Her uncle Jose.  Her stepfather Eduviges.  All manipulating these people, using them for her purposes.

Let's talk a little bit about the amount of methamphetamine in this case because I don't want you to get the misimpression that these are normal everyday amounts, be under the false sense that this is just kind of an everyday thing. These are, as I said earlier, staggering amounts of methamphetamine.

Let's try and put that in perspective a little bit here. 33 pounds of methamphetamine. This is the amount that was seized from Eric Shimomura's house that Francis Honda alerted the DEA to when he was arrested. There was testimony that -- well, everyone, I think, can agree there's 16 ounces in a pound; so there's 528 ounces in 33 pounds of methamphetamine. You heard testimony from one of the detectives, I think the special agent who's testified as to the drug value, there's 28 grams approximately in an ounce; so that's 14,784 grams. That's what's left of the 33 pounds in exhibit 4 (indicating).

There was testimony that a heavy user, a regular user, like so many of the defendants -- cooperating defendants we heard in this case, it was a gram a day was, basically, their -- their use. So the 33 pounds of methamphetamine that was seized would supply a 1-gram-a-day user for 40-and-a-half years.

Let's talk about the total weight of methamphetamine involved in this distribution ring. We know we have the 33 pounds from Francis Honda. We talked about that. There it is.

There's 26 pounds mailed from Charles Ranney to Antonio Santos because we have the label for that.  Another 13 pounds from Mr. Ranney to Mr. Santos.  There was that label, exhibit 14.  Another 10 pounds from Ranney to Santos.  Another 31 pounds from Ranney to Santos.  That's exhibit 16.  Another 38 pounds from Ranney to Santos, exhibit 17.  Another 11 pounds, this time to Michael Winings, exhibit 61.  Another 13 pounds from Mr. Ranney to Mr. Winings, exhibit 62.  Another 11 pounds to Mr. Winings, exhibit 63.  26 pounds, exhibit 64.  That's 212 pounds.  That's just from the labels we -- that were located for Mr. Ranney.

Mr. Shim testified that he mailed 50 pounds at least 15 times.  And he said he went to the airport post office in Vegas, specific time, two 25-pound boxes every time.  It's very precise.  That's 750 pounds.

Joseph Chai said he mailed 75- to 125-pound boxes, which I took the low end there, to Utah when the heat was on.  That's 1125 pounds that Mr. Shim -- or, I'm sorry, Mr. Chai mailed out.  That's 1875 pounds just between Mr. Chai and Mr. Shim.

Total with the parcels labels we recovered and the 33-pound seizure, over 2000 pounds.  Again just the tip of the iceberg.  Sheri Bulacan said she was delivered drugs probably 50 times at her house.  That didn't include the times that they went to Charles Ranney's house after he took over.

We'll round down.  2,000 pounds of methamphetamine. Let's put that in perspective.  That's 32,000 ounces.  896,000 grams.  Again heavy gram -- heavy user uses 1 gram a day. Every man, woman, and child on the Island of O'ahu could have been given a gram of methamphetamine.

This is the monies that were traced to Mr. Acuna and Miss Valenzuela.  The darker blue or the blue on the left, that's -- that shows other deposits.  That means cash -- I'm sorry.  Not -- checks, other instruments like that.  649,000. 663,000 in cash deposited, plus the just over quarter million I talked about in cash expenditures.  That's $1.5 million.  The variance: $898,196.  Unexplained.  Unaccounted for.  Until you weigh it with the evidence in this case, and look at everything in the totality of the circumstances.  The witness' testimony, the financial analysis, and there's only one conclusion:  that money was drug proceeds, drug proceeds that Miss Valenzuela and Mr. Acuna tried to launder.

Now, Miss Valenzuela's testified, Well, I don't even know what money laundering is.  She thought she did, until she got arrested.  She started out doing things correctly, but she didn't follow through.  She set up the front business.  She took -- set up various bank accounts.  But she deposited too much money into those bank accounts.  She couldn't because she had all these expenses.  $14,000 a month in mortgages alone. She can't pay it in cash.  That's just what Agent Madinger

testified about.  That's the problem with drug trafficking. You have this cash that you can't just go out and use wherever and whenever you like.  You have to transform it so that you don't rise up and throw up red flags.  So she had to deposit that money so she could use it.

She should have declared more on her taxes.  But she didn't.  If she had done one of those two things, might never have gotten caught.  Still, when you dug just a little bit deeper and looked at these houses that were in the names of Jose Valenzuela and other people, very quickly the IRS found out all the money was coming from Anabel Valenzuela. Mortgages -- mortgage payments being paid out of her accounts, cashier's checks coming out of her accounts.  But no source -- no legitimate source.  Not coming from Seventeen Again, which lost money.  Not coming from her job as a realtor.  Not those kinds of amounts.  Not coming from Mr. Acuna's so-called construction work.

Margarita Olguin, his aunt, when she was asked, Did he do construction work?  I don't know.  Well, didn't he leave construction materials and tools at your house?  No, he never left any of that at my house.  Because he -- nobody knew he was doing construction work because he wasn't.  Not after they were rolling in this case.

As I said, it's all about money.  That's what drug trafficking is about.  Even Francis Honda, who was a

relatively -- relative nobody on the hierarchy of this -- of this conspiracy, this was the $200,000 that he had that he was sending back to Charles Ranney, which was going to go to Mr. Acuna, Miss Valenzuela, and Mr. Olguin.

Money.  That's the money found in Charles Ranney's safe.  Sorry.  In his house when the search warrant at Harbor Pond.

More money.  This is when things were just starting when Mr. Ranney moved here to get things rolling.  It's all about money.  Money buys houses.

This chart was admitted into evidence, and this shows what we've been talking about.  2002, you know, things -- certainly nothing to laugh at: $91,000 in deposits.  It goes down a little bit.  Is it a coincidence that that happens to be the period in which Mr. Acuna was incarcerated?  Then when he gets out the next year, 2004, jumps up from $85,000 to $258,000?  Now the network has been set up in Hawai'i.  It jumps from 258 in 2004 to 618 in 2005?  Then Mr. Ranney gets arrested toward the end of 2005, September 2005.  Also in 2005 Luis Melendez and his boss got arrested.  Look what happens. Drops 618,000 to 486,000.  Is that a coincidence?

Then he gets arrested in 2002.  2003 he's deported. Late 2003 Charles moves to Hawai'i, and Benny comes back. 2004, Charles is back, buys the house.  $50,000 in cash to go to the attorney.  Things are going good.  2005 starts out

really good.  Anabel buys a Mercedes with cash.  Loans James Alamillo 45,000 in cash.

Then things start to go downhill.  Luis Melendez gets arrested.  Charles Ranney gets arrested.  Charles Ranney begins to cooperate.  Sheri Bulacan gets arrested.

There's the chart with the updated numbers from 2007 that Agent Mickelsen told you about.  346,000.  The number's going down more.  Their best customer is out of commission.  Is that a coincidence?

This is the copy of the verdict form that was referenced earlier, and if you find each of these defendants guilty as to count 1, then you must check one of those three boxes.

Based on all the evidence you've heard in this case, there can be no other conclusion, no other verdict, no other decision than that each of these three defendants were members of the drug conspiracy.  They knowingly, willfully not only assisted in furthering the objectives, they directed the objectives of that conspiracy, which successfully and uninhibitedly ran for almost a five-year period, bringing thousands of pounds of methamphetamine to our state.

Based on all of that evidence, the United States is respectfully requesting that you find Mr. Acuna, Miss Valenzuela, and Mr. Olguin guilty of conspiracy to distribute methamphetamine and find that the amount of

methamphetamine was 50 grams or more.

We would also ask that you find Mr. Acuna and Miss Valenzuela guilty of conspiracy to commit money laundering, for taking the drug proceeds from all of the methamphetamine that was sold here, promoting the conspiracy further by buying more drugs, selling more drugs, and further concealing it by attempting to hide it by buying real estate, vehicles, putting it in places we don't know where it is.

The defense is going to get an opportunity to argue to you now, and at the end I will have a final chance to speak to you on rebuttal. The only thing I ask, as I said before, when you weigh all of this evidence, think of it in total, think of everything as part of the big picture, and if you weigh everything in this case, in that -- in those terms and apply it to the law, you will, I believe, reach the same conclusion. Thank you very much.

THE COURT: Okay. Mr. Arakaki.

MR. ARAKAKI: Good morning, ladies and gentlemen, Mr. Inciong, and my colleagues as well. Miss Clare as well.

Benjamin Acuna thanks you. He thanks you for your attentiveness and patience. He thanks you.

Count 1 of the indictment in this case charges the defendant with conspiring to distribute, with intent to distribute, 50 grams or more of a methamphetamine in the District of Hawai'i and elsewhere.

In 2002 Benjamin Acuna had the misfortune of meeting Sheri Bulacan, who seduced him as she had a number of others, including Charles Ranney, Joeann Tavares, Marlene Ogata, Ronald Shim, Joe Chai, and Bobbie Jean Asuncion, among others.

The boss, as she was called by Ranney and others, used money and drugs to lead others in a conspiracy that targeted Hawai'i with the distribute of methamphetamines. With the admitted help of Charles Ranney, Mike Wining -- Michael Winings, and Joeann Tavares, the evidence shows that Sheri Bulacan developed a clientele which included Francis Honda, William Kila -- I'm sorry. Wayne Kila, Joanette Quintal, William Caminos, and others who would distribute the quantities of methamphetamine for her in Hawai'i. Antonio Santos was convicted of being part of that conspiracy after others, including Sheri Bulacan and Charles Ranney, testified against him.

The methamphetamine would be sent by FedEx or the U.S. Postal Services, and the millions in drug proceeds would either be carried back by fellow conspirators or mailed to Bulacan and Ranney.

We heard Mr. Inciong about the -- the proceeds going back from Hawai'i to the mainland. We heard how it went back to Ranney. We heard how it went back to Bulacan. It also went back to Miss Bautista. But we never heard of any FedEx or postal services mail going back to Mr. Acuna, Miss Valenzuela,

or Mr. Olguin.  And that is a fact of this particular case. Those are the facts in this case.

Sheri Bulacan testified that -- that at a meeting at her house on Bogey Way in Henderson, Nevada, she and Ranney agreed to have Ranney go to Hawai'i to establish a clientele to distribute their drugs.  They set a goal of making a million dollars apiece in six months.  Mr. Ranney bragged that they, in fact, made that amount.

This was the second branch of the Bulacan conspiracy into the distribution of meth in Hawai'i.  The other branch created by Joeann Tavares included Marlene Ogata and Wayne Kila, among others.

On at least one occasion Miss Bulacan and Pita Moheatau brought pound quantities of methamphetamine to Hawai'i themselves and met Bobbie Jean Asuncion and Marlene Ogata at a hotel.  And this was a different meeting than the hotel at the Hilton Hawaiian.  This incident is significant in that Miss Asuncion testified that this meeting occurred in 2002.  I would ask you to look at your notes.  I would ask you to look at your notes continually as you look at the facts in this case.

While Miss Bulacan testified that she met Benjamin Acuna in either 2000 or 2001 -- again look at your notes -- the significance is that Miss Bulacan created an elaborate story about -- about how she met Mr. Acuna.  Through Pita Moheatau,

who was being confronted by Mr. Acuna about a $30,000 drug debt, and how she just happened to have $30,000 on her to pay that debt and for Mr. -- for Mr. Moheatau and substituted herself in Moheatau's place as Acuna's customer.

Until she was arrested on January 3d, 2003, and even today Miss Asuncion believed Miss Bulacan's source to be Pita Moheatau.  She also testified that she received quantities from Bulacan about -- pound quantities from Bulacan about once a month, and not only mail the drug proceeds back to Miss Bulacan but also went to Maui once to deliver drug proceeds to her.

Pita Moheatau is also significant because he supposedly introduced Charles Ranney to Sheri Bulacan, who testified that she met Ranney in either 2001 or 2002.  Pita Moheatau is significant because of his absence as well.

The judge will instruct you in part that a reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation.  It may arise from a careful and impartial consideration of all the evidence or from lack of evidence.  Again I ask you to take a look at your notes as you decide this particular case.

Pita Moheatau was one of Bulacan's sources, a fact admitted to by Bulacan.  Only he can independently corroborate whether, in fact, Bulacan's story about her first meeting with both Mr. Acuna and Mr. Ranney occurred as she testified.  Where is Pita Moheatau?

There is also a lack of evidence in these areas:

We saw a diagram of phone calls being made to a number of individuals from Mr. Ranney.  There are some calls made to Miss Valenzuela.  Calls made to Sheri Bulacan.  But on that particular chart there are no phone calls made to the supposed source of all of this:  Mr. Acuna.  There was no -- no evidence of phone calls made to Mr. Acuna, and yet there were hundreds of shipments supposedly made to Hawai'i from Miss Bulacan, and the source was, supposedly, Mr. Acuna.

There's also no call or evidence of a call from Miss Bulacan to Mr. Acuna after Mr. Ranney was arrested.  There was no phone call or evidence of a phone call from Miss Acuna -- I'm sorry.  Miss Bulacan to Mr. Acuna after Mr. Ranney was arrested.  And these were the people who supposedly -- and Mr. Acuna was supposedly the source of all of this.

We also don't have evidence of any drug activity which occurred after Mr. -- after Mr. Ranney was arrested.  And yet we have testimony from Miss Bulacan, saying that she was not afraid or she was not concerned about Mr. Ranney ratting about her at that particular point in time, and yet there's no drug activity that occurred after Mr. Ranney's arrest.  The only person who could decide what to do about any drug activity was Miss Bulacan.

Again, as far as any mailings of FedEx packages and

postal -- U.S. postal packages, whether it was drugs or proceeds, nothing was directed to Mr. Acuna or even 1711. Please look at your notes.

Miss Bulacan also admitted that a Brad Schreiner of Long Beach, California, who was a brother of Spence Bennett, was another source who sent her 10-pound shipments every couple of months.  She also testified that a Maddy Demorado cooked or produced ice with her.  Miss Bulacan, Mr. Ranney, Joeann Tavares, and others have testified that Benjamin Acuna, Anabel Valenzuela, and Eddy Olguin are their sources for methamphetamine.

Mr. Acuna testified under oath that he provided Miss Bulacan with eightballs on two occasions prior to his incarceration on May of 2002, and he admits to providing Bulacan with quarter ounces on three or four occasions after he came back to Las Vegas at the end of 2003.  He further testified that he did so because he wanted to get the job to construct an addition to Bulacan's master bedroom.  He was seduced by Bulacan's wealth, like others.  Bulacan knew this and used him to get her drugs for her personal use when she needed it.

Her own testimony that she had to wait for the drugs at times was corroborated by Joeann Tavares, who described how they were jonesing at times for lack of the drugs.  Clearly, Mr. Acuna not only admitted to doing wrong but was remorseful,

as he recognized how he had hurt others because of his conduct, including his brother Aristoteles.  Bulacan, Ranney, Tavares, Winings, and even Luis Melendez showed no remorse for their wrongdoings.  In fact, Bulacan, Ranney, and Winings presented as proud of the fact that they were big drug dealers and criminals.

I agreed to distributing 350 pounds of meth and paying a fine of $4 million, testified Bulacan.  We set a goal of making a million dollars apiece in six months, and we did it, bragged Ranney.  Michael Winings meanwhile relished in describing how he was caught in Washington stealing a car and all the numerous bad acts that he did.  He talked about a Motel 6 incident in which somehow his particular room was trashed and windows broken.  And yet we're to believe that after that happened Motel 6 gave him another room.  He talked about how he had sex with a Mexican girl.

The court will instruct you that in considering the testimony of a witness, the jurors may take into account:

1. The opportunity and ability of the witness to see or hear or know the things testified to.

2.  The witness' memory.

3.  The witness' manner while testifying.

4.  The witness' interest in the outcome of the case and any bias or prejudice.

5.  Whether other evidence contradicted the witness'

testimony.

6.   The reasonableness of the witness' testimony in light of all evidence; and

7.   Any other factors that bear on believability.

We heard a number of Las Vegas Metropolitan Police Department individuals talk about a May 6 or 7, 8th -- May 6, 2002, incident at Saylor Way apartments which involved Mr. Acuna.  The fact of the matter is that that case was dismissed.  We can reasonably infer that there was something wrong with that particular case.

One of the most important facts in evidence is the stipulation regarding the granting of a further motion for downward departure granted by a court as to Francis Honda.  For his part in a conspiracy headed by Sheri Bulacan and her partner Charles Ranney, Mr. Honda was released from prison after doing 37 months, which was reduced from an original 70-month sentence.

Sheri Bulacan, Charles Ranney, Joeann Tavares, Michael Winings, Ronald Shim, and Joe Chai, as well as Francis Honda and William Caminos, are government witnesses motivated by the desire for a downward departure of their sentences.  They are totally interested in the outcome of this case because they know that, if the defendants are convicted, that the requested downward departure by the government will be significant.

MR. INCIONG:  Objection, Your Honor.  There's no testimony about anything with the outcome determining that.

THE COURT:  Well, he's arguing.  Overruled.

MR. ARAKAKI:  I want -- question:  Why Mr. Acuna?  That question was posed by the government.  Why Mr. Acuna?  Why not Mr. Malandrin?  These individuals are not fearful of Mr. Acuna, Miss Valenzuela, or Mr. Olguin.  But they are fearful of the -- of the source of their drugs.  They are fearful.  And they will not give up that name.  But they're not fearful of Mr. Acuna, they're not fearful of Miss Valenzuela or Mr. Olguin.  Why should they be?  You sat here for three weeks.

Miss Bulacan and Mr. -- and Mr. Malandrin, if I may, again is the individual that we had been asking Miss Bulacan and others about as far as whether they had contacts with this drug source.  And again I ask you to take a look at your notes.

Miss Bulacan and Mr. Ranney in particular are looking at sentences in the guideline range that would keep them incarcerated for decades.  They and others have testified that Benjamin Acuna and Anabel Valenzuela are sources for large amounts of methamphetamine and that Eddy Olguin assisted in drug transactions between them, Sheri Bulacan, Charles Ranney, Joeann Tavares, and others.

Francis Honda and other government witnesses have testified that they believe Charles Ranney to be the source of meth brought into Hawai'i, and that Sheri Bulacan was Ranney's

boss.  Bobbie Jean Asuncion meanwhile testified that her source was Sheri Bulacan and that she received drugs from Sheri about once a month.

During the course of the trial the various witnesses for the government contradicted each other a number of times. Simply put, according to these witnesses, the other government witnesses were lying.  Again I ask you to check your notes.

What they have in common, however, is the fact that all the percipient witnesses, who claim the defendants were sources for the drugs, are convicted felons and for the most part drug abusers.  Miss Bulacan, for example, admits to using methamphetamine since 1992 until the date of her arrest, except for a few months during that time.

Mr. Inciong indicated that a user -- a heavy user of drugs would use 1 gram a day and said that 40 pounds would last a user -- I'm sorry.  The 33 pounds that was confiscated on Mr. Honda -- or at Mr. Honda -- because of Mr. Honda's revelations to the police here in Hawai'i, that 33 pounds would last 40 years.  A quick calculation would tell you that Miss Bulacan would have used over 10 to 12 pounds of that ice if she used just 1 gram a day.  This is a witness that we're talking -- 12 pounds of ice.  We ask you not to forget your common sense and what you know for yourselves about the ice and what it can do.  12 pounds of ice.  10 to 12 pounds of ice.

What they have in common, however, is the fact that

all -- pardon me.  Miss Bulacan, for example, admits --
Mr. Ranney admits to having a cocaine problem, using it daily.
Mr. Winings, Shim, and Chai were also daily users of
methamphetamines, as well as Miss Tavares, who could not
refrain from using even while pregnant with her daughter Jada.
Miss Tavares' description of the effects of methamphetamines
was revealing.  Among other ill-effects it made her deceitful
and selfish.  She stole and cheated.  She lied.  Simply put,
she prostituted herself to the tune of $2 million.  She knows
how to get what she wants.  She knows how to lie.

Sheri Bulacan meanwhile was aloof, comfortable with
the way she used people, controlling them with drugs and money,
how she handled handguns and threatened those who did not do
what she wanted.

Michael Winings spoke for himself.  He wanted the
jury to know that he was proud of being a criminal.  He laughed
at committing a crime.

What's significant is the age of the individuals at
the time of this event.  And that, too, is in your notes.  But
what we have is a group of seasoned criminals speaking against
some very young people.

Joe Chai and Ronald Shim were also daily users of ice
and, like Tavares, prostituted themselves for the drug.  They
will merely echo whatever their boss has said.

The cocaine in Mr. Ranney brought out a grandiose

personality.  So what is a grandiose personality?  An exaggerated belief in his importance.  Exhibit 39, a photo of Mr. Ranney with thousands of dollars in drug proceeds, I think is an example of this grandiose personality.  He presented as a pompous thug, reveling as a drug dealer and a member of the Pinoy gang.

For these witnesses their days were not filled with work or sobriety or concern for their families.  They were all unemployed and admitted to same.  Mr. Ranney did have a business, but again he admitted that it was merely a front to launder his money.

They spent their time lost in the world of drugs and seeking more of the drugs.  A world of gambling and sex.  No time for work.  Common sense tells us the daily use of drugs left them incapacitated.  They were unable to work or work as would be expected by their employers.

What is wrong with this picture?

Their false testimony condemns the defendants.  Mr. Acuna, who worked hard as a construction worker, as a father, who was special to his sons Benjamin, Jr., and Christian.  I think we heard Mr. Olguin's sister describe Mr. Acuna as a father.  Mr. Acuna, who loves Anabel and was loved -- and who is loved by her, who came back to this country as an illegal alien to be with his pregnant wife and his family.

There will be photos besides other things that the government will say was taken at the Phantom -- Phantom Jet apartment.  These are photos of Mr. Acuna and Miss Valenzuela.  I ask you to take a look at those photos, and then I ask you to recall how Mr. Ranney, Miss Bulacan, and Miss Tavares presented themselves.  And this is when they're sober.

Mr. Acuna, who did not do drugs, who does not do drugs, who appreciated parents, and who bought his mom a T.V., who knew he did wrong and apologized to those he hurt.

Anabel Valenzuela, who was a good mother -- who is a good mother and a loving and hardworking wife, who did wrong as she tried to uplift her family, who recognized her wrong, who was also remorseful and apologized to those she hurt.  She also did not gamble or do drugs.

Eddy Olguin, who worked at the same job for years, who suffered financial hardship and bankruptcy, who assisted his family.  Clearly, they distinguish themselves from those that lie to hurt them in what they did, and that they did work.  They were not consumed in drug abuse.  They had family support.

And while the government believes otherwise, although they struggled, they had the funds to make mortgage payments on homes that were financed, unlike Mr. Ranney, who paid for all but one of his real estate holdings in cash.  In that particular situation regarding the money laundering, I ask you to consider the testimony of Mr. Bahena and whether or not, in

fact, you can believe that he did not contribute more than what he said he did as far as cash monies into his own organization.

Like a number of Mexican American and Mexican families, they save their money and shared what they had with their family members.  They are not perfect.  Their motivation to help their families caused them to do things which were not right.  Mr. Acuna providing drugs to Miss Bulacan for her personal use so that he could get a job to do an addition to her house.  Miss Valenzuela, who created false loan documents and tax returns to help her family get homes and not alerting the authorities to her illegal alien husband.  But they know that they did wrong and are remorseful for that, unlike their accusers.

No drug money, if any, that Mr. Acuna received from Miss Bulacan for the drugs he provided to her for personal use was ever commingled with the construction earnings or the earnings of his wife.  Furthermore, while the arguments regarding certain discrepancies in what was spent and the money available was in thousands, the fact remains that the government's not arguing that defendants -- that the defendants had millions of dollars in drug proceeds, as did Bulacan, Ranney, and Tavares.  When we look at the $4 million or the millions of dollars that Tavares and Ranney talked about, we don't see that.  And that is a fact in this case.  There was no money laundering.

We talked about -- we had testimony about Mr. Langford, and I tell you that Mr. Langford lied.

We had testimony about an eye scan. That eye scan was relative to a storage or vault that was Miss Bulacan's. There's no testimony that Mr. Acuna or Miss Valenzuela had such an eye-scan storage place.

And if Mr. Acuna is guilty of any conspiracy to possess with intent to distribute and to distribute methamphetamine because he provided to Miss Bulacan less than 50 grams of methamphetamine for personal use, it was not with regards to any conspiracy involving drugs, drugs distributed in Hawai'i or anywhere else that he knew of. Your notes will say that Miss Bulacan and Mr. Ranney were the only ones in that particular meeting at the Bogey Way address in Henderson prior to Mr. Ranney going to Hawai'i to establish a clientele for Miss Bulacan.

And again but for the traces of what may have tested positive for methamphetamine that was found in some Tupperware containers that the evidence specialist indicated, the evidence specialist did indicate that there was not an amount that could be weighed. There was also an absence of latent prints as to those particular Tupperware containers. There were no drugs that could be linked to the relevant conspiracy.

Where is the millions? Where is the drugs? Yes, we heard about 33 pounds with Mr. Honda. We heard of other

things.  But where are the hundreds of pounds of drugs? Where's the millions of dollars?  Where's the proof beyond a reasonable doubt?  Independent evidence that could corroborate the disingenuous statements of Bulacan, Ranney, Tavares, Winings, Melendez, and others.  Testimony, as Miss Bulacan and Ranney would say, against the Mexicans.  Not Americans or Mexican Americans, but testimony against the Mexicans, as though there was a difference.  And I want you to take a look at your notes again.

Benjamin Acuna respectfully asks this jury to find him not guilty of conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine and not guilty of money laundering.  Benjamin Acuna thanks you.

THE COURT:  Okay.  I'm going to let the jury take a 10-minute break.  I'm really going to hold it to 10 minutes. We're still trying to wind up in time for you folks to go to lunch, okay; so 10 minutes.

(Jury excused.)

THE COURT:  Are we going to make our schedule?  Let me hear from Mr. Flores how long do you have?

MR. FLORES:  Your Honor, I think about 15 minutes.

MR. SINGH:  10 to 15, Your Honor.

THE COURT:  Okay.  So, Mr. Inciong, on your rebuttal?

MR. INCIONG:  15, 20 minutes.

THE COURT:  Think we can do this by 1:00?  Because,

if not, I might as well let the jurors go to lunch.

And as you know, we talked about this earlier, I always try really hard not to interrupt the closings and just to have them at a stretch. I'm just worried, if we're going past 1:00, I think that's the limit I can hold them because, if we discharge the alternates and the jurors are in deliberations, we give them lunch. They'll go to the cafeteria. If they go a whole lot past 1:00, I don't think they're going to have much choice. I don't know the cafeteria can accommodate a big group like that late; so I'm kind of worried about it. So, you know, if we're going to break, my preference is to break now, not at 1:00, if we're going to break anyway.

MR. INCIONG: It doesn't -- doesn't matter to me, Your Honor.

MR. FLORES: Your Honor, no preference to me. Like I said, I should be done within 15 minutes.

THE COURT: I know, but -- but --

MR. FLORES: I don't know how long everybody else will take.

THE COURT: Right. Right.

MR. SINGH: It's up to the court, Your Honor.

THE COURT: Okay. Everybody's leaving it up to me? Nobody has any objection? Then I'm so worried about this because, even though you folks say 15 minutes, 15 minutes, 15

minutes, we'll be right at one o'clock.  And I know Mr. Inciong is giving me his estimate before he hears what two defense counsel have said; so, you know, I'm kind of worried that we're going to go past 1:00.  So I think we should let them go to lunch, and that would mean we'll come back at 1:30.

Okay.  So I'm going to tell my courtroom manager to let the jury go for lunch now.  We'll come back at 1:30.  But before you folks go, I have a couple little things to go over with you.

Okay.  This will only take a couple minutes.  One is on the form of the indictment with the redactions, is this okay with everybody?  The only question I had is whether we should take out the blank pages.  Have you guys seen this form?

MS. CONNORS:  Actually, Your Honor, the one I did give to Miss Fujinaga did have the blank pages taken out.

THE COURT:  Oh, it had it taken --

MS. CONNORS:  It had one e-mailed and then one hard copy, and I can give you the hard copy one.

I did two things:  One, I took out the blank pages and then on that last -- I took out the true bill, that last page that says "True Bill."  And also there was the part that said "Count 4" --

THE COURT:  Right.

MS. CONNORS:  -- and I whited that out.  So I think Miss Fujinaga actually has the version.

THE COURT:  Okay.  Okay.  That makes more sense to me what you're describing.

So is that okay with everybody?

MR. FLORES:  Yes, Your Honor.

THE COURT:  Okay.  Then the verdict -- the indictment will go to the jury in the form submitted by agreement.

The other question I had was some of the physical items of evidence are cell phones, and I was thinking I wouldn't send those in.  That I would -- since I think you can turn them on, I was going to hold those back along with the drug evidence and the money.  Any problem with --

MR. INCIONG:  No objection.

MR. ARAKAKI:  No objection.

MR. FLORES:  No objection.

MR. SINGH:  No objection.

THE COURT:  And the Tupperware I'm not sending in since it has drug residue in it, too.

Okay.  Then why don't you folks go to lunch.  I'll see you at 1:30.

I will want, after we're done with all the closings, to talk about the forfeiture portion in case we get there; so we need to figure out verdict forms and things like that, at least a schedule for when you guys are going to agree on the verdict form.

Okay.  I'll let you go.  I'll see you at 1:30.

(Court recessed at 12:11 P.M., until 1:35 P.M.)

THE COURT:  Okay.  Mr. Flores.

MR. FLORES:  Good afternoon, ladies and gentlemen of the jury.  Hope you enjoyed your lunch.  And I'll try to be quick and not put you to sleep in the afternoon right after lunch.  I know sometimes there's kanak-attack.

But it's been a long trial.  As you heard Mr. Inciong say, 44 witnesses came up here and testified in an effort to prove Miss Valenzuela, along with the other two defendants, guilty of these crimes that they're charged with.  But really when you look -- when you boil it all down, it just comes down to three witnesses of those 44.  There are only three witnesses who've testified that Anabel Valenzuela had any link to these drugs that were coming from Vegas to Hawai'i.  Those three were Charles Ranney, Sheri Bulacan, and Joeann Tavares.

Francis Honda never heard of Anabel Valenzuela.  William Caminos, Michael Winings, all those other people, Ronald Shim, Joe Chai, they've never heard or seen Anabel Valenzuela.  It comes down to three out of these 44 witnesses.

Now, you heard that Charles Ranney was arrested in 2005, and he made two phone calls or talked to Sheri Bulacan two times on the phone before he decided to cooperate with the government and tell them his side of the story.  We submit that in those conversations with Sheri Bulacan they were able to talk to each other and figure out what each was going to say in

the event that all of this was going to come down and that they chose three people who were easy targets.  Not their sources, as Mr. Arakaki explained.  They didn't name the people that they would be afraid of.  They named people who were easy targets.

They picked Mr. Benjamin Acuna because Sheri knew he wouldn't be able to dispute that he had given her eightballs or grams of drugs.  That Anabel Valenzuela was connected to both of them because Charles had used her in buying a house and that Joeann Tavares sold a car to her.  So they knew there's some evidence there that the government can use, and that we can use to help ourselves.  Because let's be clear, everybody in this case realizes that, when you're arrested and you're in trouble with the government, your best bet is to cooperate and try to get as much time taken off your sentence as you can.

And we saw that with Francis Honda.  He was in custody when this trial started, and he is out before the trial is done.  He's the guy who was actually caught with the 40 pounds of meth and the 200-something thousand dollars in cash.  That guy is out of jail already.  He went from a 10-year to life sentence to just about three years.

Now, you don't think Sheri Bulacan, Charles Ranney, Joeann Tavares, everybody else in this case, you don't think they know that?  Of course, they do.  They know that the more people they can turn in, the more people that they can,

quote/unquote, rat out, the better it is for them.  That's why we're here today.

Because you heard Officer Peralta say you can't just go with the story; right?  You can't just take a person's story and that's enough proof.  There's got to be corroboration.  But what did Peralta say was Sheri Bulacan's corroboration?  The fact that it matched up with Charles Ranney's testimony.  That and the money.  That was it.

When they had Francis Honda arrested and he told them about Charles Ranney, they corroborated that they did the buy-busts to get Joanette Quintal.  And Joanette Quintal's arrested, they get the phone recordings to get Charles Ranney.  They don't just take Mr. Honda's word for it.  They don't just take Quintal's word for it.  They get corroboration.  They get hard evidence.

Where is the hard evidence in this case?  Where are the thousands of pounds of drugs?  Where is all the cash?  Where is the mailing labels?  There were mailing labels that also implicated Charles Ranney.

Now, you heard the postal inspector say that in Las Vegas those mailing labels are probably gone.  But at least here in Hawai'i they exist.  They were able to pull them up for Antonio Santos, connecting him with Mr. Ranney.  They were able to go through their records quite easily and find them.

Why are there no mailing labels from Hawai'i to

Seventeen Again, if Charles Ranney said money was being mailed to Seventeen Again?  Where is it?  Where is that hard evidence?  Where is the mailing labels to any address of these defendants in Las Vegas from Hawai'i?

The other problem with just using those three witnesses' testimony to corroborate each other's, well, first of all, is that Sheri Bulacan was not a very good witness.  She could not remember half the things that were being discussed during her examination.  How many times did she say, I don't remember, I can't recall, I'm guessing, I don't know?

Number two, she's calling Charles Ranney a liar because Charles Ranney said Sheri Bulacan had a gun that time they went to visit Michael Winings to collect on that debt.  She's saying that's a lie.  She's calling Charles Ranney a liar for saying -- when Charles Ranney said that Sheri Bulacan wanted to hire a hit man to get Michael Winings.  They're calling each other liars.  Joanette -- Joeann Tavares called Sheri Bulacan a liar.

Charles Ranney, when he came back up, I asked him if Sheri Bulacan said these things, is she telling the truth or is she lying?  She's lying.  That's the problem with just using witnesses' testimony to corroborate each other's is that their memories are bad and that they their testimony, in fact, is in contradiction to each other in many instances.

Yet the government takes just these three statements

from these witnesses and runs with it.  And as you've seen in this case, the government exaggerates the evidence.  You heard in opening that Miss Valenzuela was buying millions of dollars' worth of property, when it's clear after all the evidence has come in she only put down several tens of thousands of dollars on the property.  She wasn't spending millions like Charles Ranney was in buying these houses.  In fact, the bank is the one that owns the millions of dollars of these properties.

That she owned all these cars.  Never mind the fact that they were not owned all at once, and at the most two or three, which is typical in any household:  a family might have two or three cars.  Over the course five or seven years, yeah, maybe they bought and sold some cars, but that doesn't mean that all the cars they've ever owned in that time period is proof that Anabel Valenzuela is rolling in dough.

Thousands of pounds of methamphetamine being shipped from Las Vegas to Hawai'i, when Sheri Bulacan says it's only 350.  That's what she pled to.  That's what she admitted to the court.  And part of the government's calculations, they came up with 1,125 pounds based on what Joe Chai said, and that's saying 15 shipments at 75 pounds each.

Now, you took notes during this trial and you can see whether he said each shipment was 75 pounds or whether the total shipments were 75 pounds.  Does it make sense that he was sending 75 pounds a pop when you've heard that the largest

they've ever found seized in Hawai'i was only 50 pounds?  Or does it make more sense that he was sending five pounds?  Five times 15 equals 75.

The government makes a point about 50 phone calls or so made between Charles Ranney and Anabel Valenzuela, despite the fact that he's her -- she's his real estate agent and despite the fact that on that very same phone number there are 1900 calls for that same time period.  Where are those other 1,850 calls going to?  Or on the other line where seven calls were made there were 800 total calls.  793 calls did not involve Miss Valenzuela.

Even in closing, the government exaggerates or misstates the testimony.  Did Anabel Valenzuela say she only called her lawyer after Ranney was arrested, that the calls only started then?  She was -- he was her attorney.  Of course, she's going to call him.  But there was no testimony that these calls all of a sudden started when Ranney was arrested.  That's not the testimony.

That Ringe Lane property, the fact that they had to downsize from Midnight Cowboy, the government is making it seem like all of a sudden they were broke.  Why couldn't you just move in your family or rent someplace, as if they're on the verge of homelessness.  That's not the case here.  Obviously, Anabel Valenzuela was making money and she was investing money, but she realized that, going at the rate they were going on

Midnight Cowboy, she was not going to be able to maintain those payments, and so she looked to downsize.  It was not this urgent situation that the government would have you believe: Why couldn't you just move in with your family in that three-bedroom -- that three-bedroom house, the four of you squeeze into there with your parents?

Did Anabel Valenzuela say the car insurance on the Mustang was too expensive -- I mean that she couldn't get it or simply that it was too expensive?  These are examples how the government takes something and builds it up into more than it really is.  That none of the money going into those bank accounts could have come from Seventeen Again because she was losing money on the store?  Doesn't money still come in and then bills get paid out of it?  The cash that's coming into the store still goes to the bank.  The fact that she pays more cash coming out to pay her bills and her rent so that on the tax returns it shows as a loss doesn't mean that zero money is coming in.

And that takes me to that spreadsheet, exhibit 249, prepared by Agent Mickelsen where he says that, if money is not reported to the IRS, then it's got to be drug money.  He's unwilling to accept the fact that the cash coming into her accounts could have come from rents on these properties.  He's not willing to accept that, even though we've heard testimony to that effect.

That family members could have given her money.  That $86,000 in that joint account with Mauricio Bahena could have come from him and not Anabel.  That Benny was working and making money.  That the store was generating cash income.  That there was at least some cash generated from these Las Vegas fairs.  Why doesn't he include this money in his analysis?  Because if he does, his numbers go way down.

He initially did -- you heard about it, but you won't have it on the spreadsheet -- a separate analysis where he just took the cash coming into Anabel's account.  Okay.  Because right now what you have before you, he's taking everything that's deposited, and he's saying if it's not reported on your taxes, whatever is left over, that's illegal money.

But he also did another evaluation where he just looked at the cash, and there was about $663,000.  And in that first evaluation he minused out any cash that could have come from her store, which came out to about $289,000 during that time period.  So now we're left with about 373,000 in cash that the government is saying is unexplained and is drug money.  If you take out the 86,000 that Mauricio Bahena put in for the Las Vegas Fair, that brings it down to less than 300,000 over this five-year time period or $60,000 a year in cash.  $60,000 a year in cash.

That's not including the rents which you know, for example, on Stewart was $20,000 a year.  She also had

Tuscadora.  Her parents paying her rent on Enchanting Court. Benicasm was generating rent.  And Benny's income.  Is it unreasonable that all of those items would add up to $60,000 a year?  There's a reason the government took that out of their analysis, and it's because it doesn't help.  It makes too much sense, and it doesn't help prove their case of money laundering.

The government tries to show that Anabel buying houses and cars is proof of money laundering, even though their money laundering expert John Madinger says simply spending money is not money laundering.  Just because you buy something doesn't mean it's money laundering.  And I asked him specifically, If you buy a car, is that money laundering?  No. If you buy a house, is that money laundering?  No.  Only if there's an effort made to conceal the nature of the funds, to make dirty money clean.

But in all of these cases Anabel's name is all over these transactions.  She's on the loan papers.  She's on the initial purchase agreements.  She's on the bank accounts that the payments are being made of.  She's on the title to the cars.  There's no effort to hide anything here.

She knows that $50,000 cash deposit is going to be reported to the IRS, but she makes it anyway.  She has nothing to hide.  She knows that buying a car for $28,000 is going to raise a red flag, but she still does it.  She has nothing to

hide.

Now, how do we know that Anabel is not a part of this conspiracy?  Look at these same charts.  Okay.  You heard that in 2003 and 2004, Charles Ranney and Sheri Bulacan made $1 million each in six months.

Okay.  Look at Anabel's charts for that same time period.  If she's higher up than them, she should be making just as much money or more.  Where is that money?  If she was running things while Benny was in jail between 2002 and 2003, why is her money so low during that time period?  Is it low because Benny wasn't making money?  Because if she was running the drug operation, it still should be high.  Why is it low?

If all of this stops in 2005 with Charles Ranney's arrest, why does Anabel make nearly as much money in 2006 as she does in 2005?  The fact is Anabel's income has nothing to do with this drug organization run by Sheri Bulacan and Charles Ranney.  Anabel's income has everything to do with how hard she worked as a real estate agent, a loan officer, a store owner.

Finally, the government says that they're responsible for 2,000 pounds.  At $10,000 a pound, that's $20 million.  Where is that money?  Why is it -- why does this spreadsheet only show for this five-year time period barely over a million dollars when there should be $20 million somewhere on there.  The $898,000 a month that the government is pointing out, that's less than 5 percent of what should have been made on

this 2,000-pound sale of drugs.  Where is the other 95 percent?

Sheri Bulacan can gamble $8 million, can spend millions on her girlfriend, can buy them cars and jewelry during this same time period.  $8 million just on this gambling, and we're talking about $800,000 for Anabel Valenzuela?  Does that make sense that Anabel is higher up than Sheri?  Sheri's money is so much more than Anabel's?  It doesn't add up.

The only reasonable explanation is that they were not a part of this conspiracy.  That they were named by Sheri Bulacan and Charles Ranney in an effort to cut their sentences.  And that Anabel Valenzuela, who is a hardworking mother of two and a good wife and a good daughter, a good student, working since age of 13, working hard to provide for her family, to bring them up in life to a higher level, who became very successful at what she did, and, sure, made a lot of mistakes along the way, as young people will do.  And she's admitted to that openly and honestly.  She's apologized that she's brought her family into this and that their, you know, name is brought into this, and they might be in trouble for helping her out.

But the government is taking this woman, who's a hardworking member of our society, and trying to paint her as a leader of a multimillion-dollar, multistate drug trafficking organization, and that just does not add up.

Ladies and gentlemen of the jury, Anabel Valenzuela

is not guilty of all charges.  Thank you.

THE COURT:  Mr. Singh.

MR. SINGH:  Good afternoon, ladies and gentlemen. You might think, when you were sitting here for the last three weeks, why I did not stand up and ask too many questions. Because most of the witnesses who testified did not know Eddy Olguin.  There were 44 witnesses who testified.  There were government agents.  There were lay witnesses.  There were DEA agents.  And I asked them, Do you know my client?  The answer is, No.

The government then to suggest that my client was a high roller, just like one of those individuals who came and testified here with all the money and taking a picture.  You saw that picture of one of the defendants sitting before the money with the peace, being totally happy.  That's nothing here.  My client is not part of this conspiracy.

Eddy Olguin is 26 years old.  If you look at the indictment, it states that back in the year 2000 to sometimes in the year 2005 Eddy Olguin and others conspired to sell -- send drugs to Hawai'i.  In the year 2000 Eddy Olguin was 18 years old.  And Miss Valenzuela in the year 2000 was 17 years old.

Mr. Olguin is a hardworking construction worker.  He was divorced in the year 2003.  Now, if he was selling drugs, why would he be filing for bankruptcy?  The government

presented all kind of evidence showing that other defendants have all kind of money.  Did you see a single piece of evidence dealing with my client in a bank statement showing that he had millions of dollars?

Ranney was arrested in 2005.  Now, if Eddy Olguin was conspiring with Ranney, he must have a lot of money.  And I'm sure if my client was dealing with Ranney, helping Ranney pick up drugs, drop off drugs, he would take all his money and run away to Mexico.  Why would he wait around until he got arrested?  That is because he has nothing to do with this case.

Well, let's look at the list of witnesses that the government called.  The government called Mr. Honda.  Mr. Honda does not know Eddy Olguin.  The government called Officer Moe. He testified that he does not know Eddy Olguin.  The government called Inspector Tabera who works for the post office.  He also testified that he does not know Eddy Olguin.  Then further the government called Mr. Winging -- Winings.  Winings was a funny guy, had a great story about stealing cars, going from Nevada to Washington.  Him, too, he did not know Mr. Olguin.

Then the government called William Caminos, also known as Puna.  Same thing, did not know Eddy Olguin.  Then the government called Quintal.  She took a trip to Hawai'i.  She was an innocent person, thought of doing a favor for someone so she can get a free airfare, and she got busted.  She does not know Eddy Olguin.

The government call DEA Agent William Wise.  He was the agent who arrested Ranney.  And same:  does not know Eddy Olguin.

Now, I asked Mr. Wise when he arrested Ranney whether there was a cell phone that Ranney had on him and whether there were any phone numbers that Ranney had called.  Usually, when you call someone, if you're doing drug deals, you will have the individual's telephone number when you redial.  There was no telephone number of Eddy Olguin.

Now, Joseph Chai, the next witness for the government.  He was a helper for Bulacan.  Same:  did not see Eddy Olguin delivering drugs.

Ronald Shim.  Mr. Shim is an interesting one.  He's the one who testified that he received drugs from Mr. Olguin in a parking lot in a casino.  He was not very happy, he was upset that he had to do the delivery, and he left 50 pounds of ice on the back of a truck unsecured.  Now, you think about it.  Would you leave a suitcase in a parking lot on a casino parking lot unsecured?

Moving along, we had another officer, Mr. Yanis.  He testified.  He testified that he did stop Ranney, he did take his phone, and he did look at the telephone numbers.  And there was no telephone number of Eddy Olguin when he made that stop.

Then we also have another detective from Nevada:  James Burns.  Same thing.  He works in Nevada, in Las Vegas.

Never heard of Eddy Olguin.

Detective Silva, the same thing:  never heard of Eddy Olguin.

Bobbie Asuncion never heard of Eddy Olguin.

Sheri Bulacan.  She testified, well, she did see Mr. Acuna with some other dude.  Who is this other dude?  Could that be Primo?  You heard the testimony of Mr. Acuna and Mrs. -- and Mrs. Valenzuela.  She indicated that there was a person named Primo, and he's not here now; he's in Mexico. Now, we all know that Miss Bulacan was doing ice since 1992. What state of mind was she when she saw this individual?  Does she really know what she's talking about?

Finally, we have Joeann Tavares.  She started doing drugs when she was 11 years old.  Now, do you think she will be able to I.D. someone?

You also heard the testimony of my client's mother. She testified Mr. Olguin is a good father, he works in construction and does not do drugs.  You heard the testimony of his sister.  She said the same thing.  They even called his ex-girlfriend.  I asked her whether she had seen Mr. Olguin doing drugs.  Nope, there's no drugs.

So the government calls 44 people.  Of the 44 individuals we have maybe three individuals who claim that they may know Eddy Olguin.  But they're not sure.  We asked them, When did you see him?  I don't know.  What time was it?  I

don't know.  Is the government sure that they got the right person here?

And Mr. Honda, he's out there, and he had a lot of drugs.

Ladies and gentlemen of the jurors, there is not a single piece of evidence in this case linking to Eddy Olguin; so I will ask you to come back with a verdict of not guilty. Thank you.

THE COURT:  Mr. Inciong.

MR. INCIONG:  Thank you, Your Honor.

Let's put things in perspective here.  In a trial like this everybody in the courtroom has a role.  The role of the defense attorney is to vigorously defend their client no matter what.  That's what their -- that's what their duty is. Which these -- these attorneys have done in this case.  The role of the prosecutor is to seek justice.  The duty of the jury is to determine the truth and render a verdict accordingly.

So when we hear this talk about misstating the evidence or exaggerating, think back as to who really was doing that in this case.  And, actually, it started right at the beginning.  In Mr. Flores' opening statement he talked about all these cosigned loans between Miss Valenzuela and other people.  There was only one cosigned loaned in this entire case, and that was for a vehicle.  It had nothing to do with a

house.  So that was a misstatement and exaggeration.  He said Anabel bought a few properties.  That was a minimization.  She bought five houses.  He said that she admits she's bad at taxes.  That was the quote from his opening statement.  She falsified her tax returns is what he really meant to say.

As much as I would like to to go and address every single point that the defense brought up because there's just -- it's rife with error, everything that was brought up by the defense will fall into three categories.  The evidence was misstated.  Let me give you some examples.

Mr. Singh just said that the witnesses were not sure of Eddy Olguin's identity.  Nobody testified that they weren't sure of Eddy Olguin's test -- of his identity.  Charles Ranney was sure, Sheri Bulacan was sure, Ronald Shim was sure, Luis Melendez was sure, who Mr. Olguin doesn't even want to talk about.  He doesn't even bring him up in his closing because that's the person that his client dealt with primarily was Mr. Melendez as well as Mr. Ranney.

Mr. Arakaki says that Charles Ranney was not in fear of these individuals.  That's why he was willing to turn them in, even though it's all a story.  Well, if you recall, Charles Ranney would not cooperate.  Right when he was arrested the first statement he made to his -- to the interviewing agent was I can't cooperate because they know where I live.  Mr. Ranney told you he's been in the Special Housing Unit, the SHU,

solitary confinement, for the last three years.  That there's a contract, a bounty on him.  That's why he's been moved from facility to facility.  Are you trying to tell me that somebody who he's not cooperating against has a bounty on him?  Are you trying to tell me that Charles Ranney is not in fear?

The retinal scan, that was another example.  It was proposed by the defendant that there was no -- or the defense, there was no testimony other than Miss -- from Miss Bulacan.  Charles Ranney's the one who testified about the retinal scan and testified that he heard it from these defendants, and that's where they had their money, along with Miss Bulacan.  That was the testimony.

The other example, a second category, all their points:  Irrelevant.  Things that are trying to, basically, let's smear these witnesses in any way we can.  "Michael Winings had sex with a Mexican girl."  What does that have to do with anything?  Why was that even brought up?  Why is the defense trying to make Joanette Quintal out to be promiscuous, asking her how many times she had sex with Charles Ranney?  Why are they asking Joeann Tavares about whether she used ice when she had her baby?  Do you think Joeann Tavares needs to be reminded about that?  Do you think she doesn't feel like the worst person in the world about that?

Why are they going after character assassination against these people?  It's to divert your attention, put

anybody but their clients on trial.  However they can.  Everybody is lying.  Robert Langford is lying.  The accountant is lying.  Everybody is lying but these three defendants; right?  These are the three truthful defendants here.

Mr. Acuna comes back into the U.S. over and over again, despite being told you are not allowed in our country, who doesn't file tax returns, who sells drugs.  Miss Valenzuela, who commits mortgage fraud, forgery, tax violations.  Who are the criminals?  The criminals have plenty of company in this case.

Instruction number 1 says you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.  Yet, they want to get up here and talk to you about their families, their kids, what a good mother they are, what a good father they are, what a hard worker she is.  You cannot consider any of that.  That cannot be -- enter any part of the equation in your deliberations.

These are defendants that are so desperate to shift the focus and shift the blame that they will admit to federal crimes like the ones I just mentioned:  tax evasion, mortgage fraud, immigration violations.  That's how desperate they are.  The only people that are willing to admit to those types of things are people that are willing -- that are facing, I should say, even more serious charges.

Mr. Arakaki says that there was no commingling of any

of the funds.  If you look at jury instruction number 29, if there's any amount of drug money that goes in with what may be other legitimate money, all of those funds are tainted.  They are all considered to be drug proceeds at that time.  And jury instruction 29 will tell you that.

Now, Mr. Flores completely misunderstood or is misrepresenting what was -- was argued.  We never said every single cent had to have come -- that there couldn't have been other possible sources.  But what these investigators operate on is evidence, not what ifs, what is possible, what might be. They talked about this whole laundry list of rental income or it could have been from this, it could have been from that. There was no evidence of any of that.  Miss Valenzuela herself testified that the rents they were charging didn't even cover the mortgages.  How do you get to $898,000 in a difference without any further explanation?

I thought it was interesting that the defense thinks that it's a persuasive argument to say, Well, if you do this and do this and make this adjustment to the numbers and do this adjustment to the numbers and assume this and take in this possibility, then there's only $300,000 unaccounted for. That's still not a lot of money?  Where's the money?  Where's the money?  Where's this money?  What drug dealer is possibly going to be stupid enough to deposit all of their money into a bank.  That's the whole point:  They're hiding it.

Sheri Bulacan's money wasn't in a bank.  Charles Ranney's money wasn't in a bank.  And Charles Ranney didn't pay millions of dollars -- buy millions of dollars of real estate.  That was a misstatement by Mr. Flores.  And again he's trying to get more mileage out of this thing.  Oh, the government exaggerated and said we said she bought millions of dollars of property.  We said the five houses were worth $2.1 million.  That's what was said.

Where are the labels?  Where are the parcel labels?  Las Vegas doesn't keep them.  That was the testimony from the inspector.  There was also testimony that the labels were only kept for six months back until they changed it after this investigation started.

This is a historical investigation.  When they arrested Charles Ranney and Francis Honda and that crew in September of 2005, the earliest -- the most recent parcels they could get would have been February of '05.  That's it.  So that's where the labels are.  They didn't exist because they were destroyed because the postal service only kept them for six months at that point.

Like it was pointed out, there weren't even any parcels found to addresses of Sheri Bulacan coming from Hawai'i.  And as the defense agreed, she was getting millions and millions of dollars sent to her.  Right?

Malandrin, this made up name that comes out of -- you

know, Mr. Acuna makes up up on the stand.  He says, Oh, that was Sheri Bulacan's source.  There's no evidence of that whatsoever.  The only evidence is she was Mr. Acuna's source or he or whoever he is.  That's who he got the drugs from. There's no evidence that Miss Bulacan ever got drugs from him.

Where's Pita?  Where's Pita Moheatau?  Who cares? Pita Moheatau was explained was her source -- Sheri Bulacan's source in the early 2000s.  She ditched him because he couldn't give her the amounts she needed and went to Mr. Acuna.  Do you really think that, if Pita Moheatau had testified and said, Oh, yes, I was there, and I was there when Miss Bulacan saved me from Mr. Acuna and paid my $30,000, do you think the defense would accept that?  No.  I guarantee you they would have another story.  Well, now you can't believe Pita Moheatau. There's always going to be something.

Same with the earlier California sources that were talked about.  It was clear in the early 2000s Miss Bulacan had other sources.  Once she found Mr. Acuna, he became her exclusive source because only he could give her the big shipments.  I'm not talking about 10 pounds.  We're talking about 20, 30, 40, and up.

And, please, go back and check your notes.  And I will bet my life that Joe Chai did not say it was 75 pounds total in those 15 shipments.  It was 75 to 125 pounds each shipment.  Another misstatement for the defense.

The phones.  They wanted to make a big deal about the phones.  How many times did we hear from Mr. Ranney and Miss Bulacan these phones, they were dumping them left and right.  Charles Ranney estimated he had 30 to 40 phones.  They were swapping out the SIM cards that they got from Benny and Anabel and Eddy's shop:  Sin City Wireless.  The analyst told, Yeah, what's common, what do I see very often these days? Prepaid phones.  No way to tell who the subscriber is.  That's why there's no phones because they're not dummies.  They weren't going to keep the same number.  Even Mr. Acuna admitted that he switched phone numbers throughout this course of this time.

Supposedly, Mr. Acuna apologized to his brother Aristoteles.  Well, I would hope so because he made him come in here and, basically, made him choose that he was either going to lie under oath or he was going to turn his brother in. That's the position that he put his brother in.  That's why he was trying to walk the tightrope because he didn't want to lie. You could tell.  He was trying to say, Well, I said maybe, he might have.  He was trying to hedge it because, of course, he's going to feel loyalty to his brother, too.  Mr. Acuna, being the dear brother he is, put him in that position.

Mr. Arakaki says, Well, you can presume that there was something wrong with the May 2002 case in Las Vegas. That's why it was dismissed.  Well, there's no evidence of

that.  And there must be some merit to it because you're hearing about it today.

The argument that's being made, Well, the outcome, the outcome of this case, that determines how much these people are going to get.  It's all about the outcome.  We already told you Francis Honda got released a month early, before the trial was over; so how could the outcome have anything possible to do with it?

Common sense tells us you're incapacitated by ice, one of the defense counsel said, and Mr. Singh echoed that or suggested that.  There's no evidence of that.  There's no evidence that ice makes you blind.  There's no evidence that ice makes your memory disappear.  There's no evidence of that.

What does ice do?  I don't know.  There's no evidence of that.  We didn't hear anything about what ice does to a person's memory in this case.  What we did hear was a bunch of ice users give very specific details on a number of events over a long period of time.  And again the defense is mixing up ability to remember details with ability to remember dates.  So don't let them confuse you on that.

Robert Langford lied, period.  About what?  What did Robert Langford supposedly lie about?  And think very hard about whether there was testimony whether Anabel Valenzuela called Mr. Langford before Charles Ranney was arrested because I don't believe you'll find anything like that.

Defense says there was only one meeting -- there was this one meeting, and only Charles Ranney and Sheri Bulacan were there to decide about sending drugs to Hawai'i.  Well, again it's a basic misunderstanding of conspiracy law.  Go to your jury instructions to pages 16 through 20, particularly page 20, and it will tell you all the co-conspirators need not join at the same time.  All the co-conspirators need not even know of other co-conspirators as long as certain things are met, as long as they are involved, as long as they are aware of the objectives and intending to help accomplish them.

Don't be fooled into this myth that Sheri Bulacan, Charles Ranney, Joeann Tavares, Ronald Shim, Joseph Chai, and all the rest, all had to be sitting around this round table saying, Okay.  We all agree we're all going to conspire to distribute methamphetamine.  That's, basically, what the defense is arguing.

Where are the millions?  Where are the millions of dollars?  Again, nobody's dumb enough to do that.  But there was 1.5 million in deposits in those bank accounts.

Saying there was no drugs that you could weigh at the Phantom Jet.  The detective said he scraped the drugs out of the Tupperware containers, and there was approximately 1.7 grams and there was residue left.  There can't be residue if there wasn't drugs there to begin with.

Where are the drugs?  Where are these drugs?  That

was the testimony, too.  And just talk about common sense, please use your common sense.

What person -- and Sheri Bulacan, you know, she thought I was probably the dumbest person in the world when I was asking the question when I said, Well, why -- why would you get rid of those drugs as soon as you could?  That's what she testified to.  As soon as the drugs came, we unwrapped them, weighed them, repackaged them, and got them out of there.  Well, why?  Why would you do that?  Because I don't want it around my house.  I don't want to get caught.  It's, like, who wants 30, 40, 50 pounds of methamphetamine in their house?  You want it out as fast as you can.  Nobody's going to leave that amount laying around for any type of time.

Sheri Bulacan wasted millions probably on drugs, on drug use, or giving other people drugs.  These defendants, apparently, were smart enough not to be drug users.  They didn't cut into their profits.  They had even more money.

Mr. Arakaki makes it seem like Mr. Ranney and Miss Bulacan were being derogatory when they referred to the three defendants as the Mexicans, like it's a derogatory term.  Mr. Acuna is Mexican.  He's not Mexican American.  He's not American.  He is Mexican.  And wasn't it Mr. Arakaki who said in his opening statement, Wealthy Hawaiians took them down?  Was that derogatory toward Hawaiians?

Everybody's lying, including Mauricio Bahena.  What

possible motive would Mr. Bahena have to lie?  He lost money on these fairs, which Miss Valenzuela corroborates.  What possible motive would he have to lie?

The defense is, apparently -- they're upset that there wasn't an apology from all of these cooperating defendants.  Well, I don't know who they were supposed to apologize to, but they've all accepted responsibility.  They've pled guilty.  Something these three refuse to do.

You know, we heard very, very little from the defense about Mr. Luis Melendez.  Why is that?  Because they can't explain him away.  They come up with this whole story about the Bulacan thing and, oh, she was calling and the two phone calls she had with Charles Ranney, they hatched this whole scheme and they got all these other people involved and got everybody to be on the same page.  But it can't explain away Luis Melendez, who never knew any of these people, had nothing to do with them.  And by the way, Luis Melendez was out of custody already when he served his sentence in this -- when he testified in this case.  He's done.  What benefit was he going to get?

You have Mr. Olguin and Mr. Flores brought up this: Oh, my client was whatever, however old he was in 2000.  Again go to jury instruction number 20.  Not everyone is required to join the conspiracy at the same time.  The conspiracy started in 2000 when Sheri Bulacan was first finding her sources to send drugs to Hawai'i.  That's why it says 2000.  It wasn't

until later when she met Mr. Acuna and when they started really dealing with each other in 2002 that things started progressing.  So don't fall for my client was 16 years old in 2000.

Mr. Olguin says, well, he filed bankruptcy in 2003.  Well, again you've heard the testimony.  Mr. Olguin didn't come in the picture until later, until after everything was established between Sheri and Mr. Acuna.  Then Charles Ranney started dealing with him.  Then Luis Melendez started dealing with him.  That was after 2003, which gives even more motive.  He'd just come out of bankruptcy.  He wasn't making any money.  He was making 20,000 a year in his best year.  He had these kids to support.  But he's driving a truck with a $700-a-month car payment.

The reason why there isn't financials -- we didn't get into any financials in any length on Mr. Olguin is because he's not charged in the money laundering offense.  There was no reason to get into that with him.

Primo.  Let's talk about Primo.  There was the suggestion that, well, you know, this Primo is another person.  It's really not Eddy Olguin.  It's our other cousin, who we call Primo.  But when Mr. Singh asked Anabel Valenzuela, Does Eddy look similar to Primo?  Oh, no, no, not at all.  They don't look anything alike.  Pretty much dashed that defense.  By the way, of the 44 witnesses, only 41 were for the

government.  There were three defense witnesses, if you recall.

Mr. Flores says, There was only three witnesses against Miss Valenzuela.  There's only Charles Ranney and Sheri Bulacan and Joeann Tavares.  That's it.  Only three.  Only three people who identified her, picked her out, gave precise corroborating testimony about what they had done with her.  Testimony that was corroborated further in Joeann Tavares' case by the blue Mustang DMV records, which show that they were transferred over to Anabel's mother, just like she had said when she paid the drug debt.  But it's those three witnesses plus the financial evidence.

Again they don't want to talk about the 800,000, nearly $900,000 in variance between deposits into her accounts and reported money.  Oh, it could be this, it could be that.  Where is it?  Where's the evidence of it?  There's no evidence of any other source.  Miss Valenzuela couldn't tell you herself.  And I'm even more confused today because now it's like which is it?  Was it construction money from Benny or was it money from the store?  Because depending upon which attorney you listen to, it's a different story.

The vehicles.  You know, the arguments say, Well, the government was overexaggerating and puffing this up that, you know, all these vehicles were owned at the same time.  Nobody ever said they were all owned at the same time.  The only person who testified to that was Karla Soto, who said three of

them were owned at the same time.  But remember these vehicles, the Cadillac Escalade, the Mercedes-Benz, the BMW, the Silverado trucks, and the Acura TL, that was 2004 to 2006.  It wasn't spread out over a long period of time, several years. This is 2004 to 2006.

Miss Valenzuela made no effort to hide anything. That's what Mr. Flores says.  No effort to hide anything.  So why is she forging names?  Why is she having other people fill out loan applications?  Why is she saying that they work at her store, making far in excess of what her store ever grossed?

And that's the other thing.  They talk about these charts and these summaries are -- are slanted.  They are slanted:  to the benefit of the defendants and Miss Valenzuela. This was based on gross income.

The analysis gave her the benefit of the doubt. Gross income means nothing is withdrawn for taxes, insurance, whatever your other automatic deductions we all get from our paychecks.  Living expenses, all those things, none of that is deducted.  And if you're anything like me, when I look at my check and I look at the top, I'm, like, I like that number, but the problem is by the time I get to the bottom after all the withholdings and deductions, the number's not so good anymore. So there's a -- there's a big difference.  I mean that number would go way, way up if we included all those things.  But, no, it wasn't.  It was slanted toward the benefit of the defendant.

Defense says there should be $20 million that was made in this case.  There may well be.  I wouldn't doubt that for a minute.  Maybe more.  It's not going to be deposited in Anabel Valenzuela's bank accounts.

Please consider all the evidence as a whole and the totality of the circumstances.  Really look and see who was telling the truth in this case and who wasn't.  I think it will be very clear when you reach the end of your deliberations that these three defendants are guilty of conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine, and Mr. Acuna and Miss Valenzuela are also guilty of money laundering those drug proceeds.  Thank you very much.

THE COURT:  Okay.  Can I see counsel at the bench.

(At sidebar on the record:)

THE COURT:  I forgot to ask when I finished reading the jury instructions if there were any objections to the instructions as I read them.

Mr. Inciong.

MR. INCIONG:  No, Your Honor.

THE COURT:  Mr. Arakaki.

MR. ARAKAKI:  No, Your Honor.

THE COURT:  Mr. Flores.

MR. FLORES:  No, Your Honor.

THE COURT:  Mr. Singh.

MR. SINGH:  No, Your Honor.

THE COURT:  Thank you.

(In open court on the record:)

THE COURT:  Okay.  At this time since the 12 members of the main jury panel are still here, we are going to excuse our two alternates, Mr. Takata and Mr. Uyema, with thanks for your patience.

I have to say, though, that you are only being discharged conditionally.  And when I say that, I am telling you you cannot discuss the case with anyone, you cannot pay any attention to news reports, read or listen to any news reports about this case, until the main panel has also been discharged.

What happens here is they will be deliberating.  I know I told you when the case began that this case has phases.  When they come back with their verdict, they will have completed the first phase.  There is another phase.  It's not anywhere near as long as phase 1.  Whatever happens in the courtroom I expect will be measured in minutes or hours, not in days or weeks of courtroom proceedings.  But I do need the two alternates to keep in mind these instructions.  You are discharged conditionally.

Now, I am giving you these really valuable certificates of appreciation that you cannot buy.  You have to earn them by serving as a juror.  My courtroom manager will give these.

And I ask you to go to room 267.  You have to turn in your juror badges.  Leave your notebooks with your notes on your chairs when you go.  Thank you very much.

All rise for the alternates.

(Alternates excused.)

THE COURT:  You can be seated.

Okay.  Now, for the 12 jurors the schedule will be that I will expect that you deliberate for the remainder of today.  If you have not completed your deliberations, then I ask you to return to begin no later than 9:00 P.M. tomorrow again, going for -- I'm sorry?

THE CLERK:  9:00 A.M.

THE COURT:  9:00 A.M.  Thank you.  9:00 A.M. tomorrow.  And go the full day, unless you reach a verdict before then.  Okay?

Now, while you are deliberating the court will provide lunch for you so you will not be required to bring your own lunch, if you are still deliberating at lunchtime tomorrow.

At this time let me call forward the court officer into whose hands you are going to be delivered.

And could I have the oath or affirmation administered.

THE CLERK:  Please state your name and spell your last name.

THE BAILIFF:  Kevin Thomas, T-h-o-m-a-s.

THE CLERK:  Please raise your right hand.

(Bailiff sworn to take charge of the jury.)

THE CLERK:  Thank you.

THE COURT:  Okay.  So, ladies and gentlemen, you are to follow Mr. Thomas.

Now, you will have exhibits that have been received in evidence, except that some of the physical items will be held here, and, if you need to examine them, you have to request to examine some of those items.  Okay?

(Jury excused.)

THE COURT:  Okay.  You can be seated.

I would like to hear from the defense attorneys whether their clients are asking to be present for resolution of any jury questions.  If the clients are waiving their presence, then my normal practice would be, if I get a jury question, I would fax it to all the attorneys and then hold a conference call by telephone to resolve what answer I could send in writing to the jurors.

If the defendants are not waiving their presence, then the attorneys will all convene in the courtroom, the defendants will be brought forward, we'll have an on-the-record discussion about responses, and then in that way respond to jury questions.  So we'll go off the record while defense counsel consult, if they need to.

(Counsel and defendants conferring.)

THE COURT:  Okay.  We'll go back on the record.

Mr. Arakaki.

MR. ARAKAKI:  My client would waive his presence, Your Honor.

MR. FLORES:  And for Miss Valenzuela, she'll waive her presence.

MR. SINGH:  Same here, Your Honor.

THE COURT:  Okay.  Then we will follow my fax and phone procedure.

Okay.  Now, I did want to talk a little bit about the forfeiture jury instructions, which we did resolve a few days ago.  I noticed some things.

There was a reference to a special verdict form, and I would like to suggest that we use the plural.  This occurred in the forfeiture instruction that everybody agreed to that includes the following words:  "While deliberating you may consider any evidence offered by the parties before your previous deliberations.  A special verdict form has been prepared for your use.  With respect to the property you are asked to determine whether it is subject to forfeiture to the United States."

I suggest that we change the words "A special verdict form has been prepared for your use" to be "special verdict forms have been prepared for your use."  Can that change be made by agreement?  Everyone seems to say okay; so I will do

that.

Similarly, we have an instruction that includes the following words:  "I instruct you that in considering your forfeiture verdicts you may not consider the degree to which a particular defendant was involved in the offense because, by law and as the special verdict form provides, each defendant is liable for the entire amount of the money judgment."

I suggest that the words "as the special verdict form provides" be changed to "as the special verdict forms provide." Can that change be made by agreement?  Everybody seems to be indicating yes.

And then the final amendment that I am proposing occurs in the following sentence.  The sentence reads: "Everyone must agree whether the preponderance of the evidence proves that such property constitutes the proceeds of the drug trafficking violation of which the defendants were convicted, or that such property was used or intended to be used in some way to commit or facilitate the commission of the drug trafficking violation of which such defendants were convicted, or that such property was involved in the money laundering violations of which the defendants were convicted."

Instead of saying "Everyone must agree whether the preponderance of the evidence proves that such property constitutes the proceeds of the drug trafficking violation," I suggest an amendment so that it reads "Everyone must agree

whether or not the preponderance of the evidence proves that such property constitutes the proceeds of the drug trafficking violation."  Because they have to be unanimous whether they are saying yes or no, and this instruction only posits that everyone must agree whether the preponderance of the evidence proves.  I suppose the word "whether" could include yes or no, but it might be clearer if we indicate whether or not.

Is there any objection to that change?

MR. INCIONG:  No, Your Honor.

THE COURT:  If not, then I'll make that change also.

Okay.  And then could I hear when the special verdict forms for the forfeiture count might be agreed upon?

MS. CONNORS:  Your Honor, I've gone ahead and prepared some draft copies.

THE COURT:  Oh, good.

MS. CONNORS:  I have one for the court and one for each --

THE COURT:  Okay.  Then if counsel can look at that. If there are objections, if you could call my courtroom manager to let my courtroom manager know that there are objections so that I can resolve those.  If we do not hear that there are objections, we will conclude that this is to be given as agreed upon.

Okay.  Now, my first -- I already have a suggestion. First of all, on this proposed special verdict form for

forfeiture, I think we should remove Mr. Olguin's name from the case caption, and that occurs -- and then I don't know if you want -- this verdict form is so long, as it needs to be, but I'm wondering if you want to keep Miss Valenzuela and Mr. Acuna together in this -- on this verdict form, or if there is a request to separate them out.  Let me hear from the parties. This is a little more difficult to separate out, it seems to me, but -- but I'm open to discussion on that.

MS. CONNORS:  You know what I could do, Your Honor, is maybe I could -- where it says "yes or no," I could break it up, Anabel Valenzuela and Benjamin Acuna.  As opposed to creating a whole separate form, maybe on that "yes or no" block I could figure a way to put in the two separate names.

THE COURT:  That's another way to do it, yeah.  In other words, the verdict form right now just says "yes or no." I think we somehow do need to have Mr. Acuna and Miss Valenzuela separate, but whether we need to have it in two entirely separate verdict forms or whether a single verdict form with Mr. Acuna's name separate from Miss Valenzuela's name after each piece of property, whichever is better.  You know, if the parties have a preference, let me hear it.

MR. ARAKAKI:  Your Honor, I think the division as stated by Miss Connors is fine.

THE COURT:  Okay.  Mr. Flores.

MR. FLORES:  I agree, Your Honor.

THE COURT:  Okay.  Then, Miss Connors, if you can do it that way with a "yes or no" for each of the two defendants and take out Mr. Olguin's name, then that will be given as modified by agreement.  Okay?

Okay.  I think that's everything we need to do.

Make sure you give the courtroom manager contact information for all of you.  I'd like to thank all of the attorneys for all of their hard work, your professionalism, your integrity, and the assistance each one of you gave to me during this trial.  I thank you all, and I will be talking to you all again.  Thank you.

(Court recessed at 2:45 P.M., it until called.)

COURT REPORTER'S CERTIFICATE

I, Debra Kekuna Chun, Official Court Reporter, United States District Court, District of Hawaii, do hereby certify that the foregoing is a full, true, and complete transcript from the record of proceedings in the above-entitled matter.

DATED at Honolulu, Hawaii, April 28, 2009.


/s/ Debra Chun

DEBRA KEKUNA CHUN

RPR, CRR